**FIRST BRANDON NATIONAL BANK, Appellant,**

v.

**Sharon KERWIN–WHITE, Appellee.**

Civ. No. 89–145.

United States District Court,
D. Vermont.

Jan. 31, 1990.

**628**

Michael Palmer, Palmer & Associates, Middlebury, Vt., and Gleb Glinka, Cabot, Vt., for debtor.

James F. Carroll, Kelley, Meub, Powers & English, and Olin R. McGill, Jr., Middlebury, Vt., for First Brandon Nat. Bank.

## OPINION

BILLINGS, Chief Judge.

In this appeal First Brandon National Bank contends that the bankruptcy court erred in confirming the debtor's Chapter 12 reorganization plan. The court agrees. For the forthcoming reasons the bankruptcy court's order confirming the plan is reversed and the case is remanded to the bankruptcy court to allow the debtor to prepare a new plan consistent with this opinion.

## I. BACKGROUND

Sharon Kerwin–White, debtor and appellee in this case, operates a sheep farm on property which straddles the Vermont towns of Cornwall and Bridport. In August 1988, she filed for relief under Chapter 12. At that time appellant First Brandon National Bank was the debtor's most senior secured creditor and held promissory notes for approximately $84,600 which were oversecured by a lien on the debtors real and personal property.

In March 1989, the bankruptcy court confirmed a reorganization plan in which the debtor agreed to satisfy in full her debt to First Brandon by transferring a portion of the real property (collateral) equal in value to First Brandon's claim. After a hearing the bankruptcy judge determined that the fair market value of the 113 acres of Bridport land was $613/acre. Since the total value of the Bridport property was insufficient to satisfy First Brandon's claim, the bankruptcy court ordered the debtor to transfer additional acreage in Cornwall, which the court valued at $2,700/acre, to provide the difference. The plan provided that the second and third mortgages, held by other creditors, would move up to first and second, respectively, and be paid in full.

The bankruptcy court also held that First Brandon's appraisal costs were used to support its litigation and thus, were not proper administrative expenses of the estate. Finally, at a subsequent hearing, the bankruptcy court concluded that First Brandon's mortgage did not provide for attorneys' fees in anything other than foreclosure proceedings; thus, the court refused to allow First Brandon to recoup these costs under 11 U.S.C. § 506(b).

First Brandon now appeals the bankruptcy court's rulings on several grounds:

(1) debtor was not a "family farmer," pursuant to 11 U.S.C. § 101(17), on the date she filed her petition;

(2) the bankruptcy court erred by holding that 11 U.S.C. § 1225(a)(5) authorized the debtor to surrender less than all the collateral without allowing the bank to retain its lien on the remainder;

(3) the bankruptcy court's findings on the value of the Bridport and Cornwall lands were clearly erroneous;

(4) First Brandon is entitled, as an oversecured creditor, to attorneys' fees pursuant to the agreement and 11 U.S.C. § 506(b); and,

(5) First Brandon is entitled to recover its appraisal costs as an administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A).

## II. DISCUSSION

A. *Eligibility of Debtor Under Chapter 12*

■ First Brandon initially argues that the debtor is ineligible for relief under

Chapter 12 because she was not a "family farmer," pursuant to 11 U.S.C. § 101(17)(A), at the time the petition was filed. This court, however, need not address the issue because First Brandon neglected to raise it before the bankruptcy court; hence, it is considered waived. *See In re Ozark Restaurant Equip. Co.*, 850 F.2d 342, 346 (8th Cir.1988) ("As a reviewing court the district court is not empowered to consider an issue not raised in the bankruptcy court."); *Dallas v. S.A.G., Inc.*, 836 F.2d 1307 (11th Cir.1988).

■ To escape this bar, First Brandon suggests that eligibility is jurisdictional and thus can be raised at any time. This assertion, however, is against the weight of authority and is thus rejected.[1] *See Rudd v. Laughlin*, 866 F.2d 1040, 1042 (8th Cir. 1989); *In re Phillips*, 844 F.2d 230, 235 n. 2 (5th Cir.1988). To hold otherwise would allow creditors to attack collaterally a reorganization plan months after it has been approved. *See In re Jarvis*, 78 B.R. 288, 289 (Bankr.D.Or.1987). The better view is to regard eligibility as a defense which is waived if not raised in a timely fashion. Accordingly, the court declines to address the eligibility issues raised by First Brandon.

B. *Surrender of Property Under 11 U.S.C. § 1225(a)(5)(C)*

■ First Brandon contends that 11 U.S.C. § 1225(a)(5) requires the debtor to either surrender all of the bank's collateral or retain its lien on the property not surrendered. In essence, First Brandon believes that even if the bankruptcy court fixed the value of the collateral surrendered as equal to the underlying debt, it should be protected from any shortcomings by retention of its lien on the remaining collateral. The court agrees.

Section 1225(a)(5) states that a court should confirm a plan with respect to each allowed secured claim if:

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of a claim is not less than the allowed amount of such claim; *or*

(C) the debtor surrenders the property securing such claim to the holder;

11 U.S.C. § 1225(a)(5) (emphasis added).

Because First Brandon has not accepted the plan in this case the plan must be approved under one of the two nonconsenting secured creditor provisions. §§ 1225(a)(5)(B) or (C). Subsection (B), the cram-down provision, allows property to be distributed in satisfaction of the creditor's claim but requires that the lien securing the claim be retained. In contrast, subsection (C) authorizes the debtor to surrender "the property securing such claim" but does not require that a lien be retained.

Since the plan did not provide for retention of First Brandon's lien in accord with subsection (B), it could only be confirmed pursuant to the surrender of property provisions of subsection (C). First Brandon contends that the word "the" preceding property in subsection (C) mandates that the entire collateral be surrendered to the nonconsenting creditor. The debtor argues, however, that this is an unduly restrictive interpretation which would thwart Chapter 12's purpose of providing emergency relief to family farmers.

To bolster its position the debtor relies on 11 U.S.C. §§ 1222(b)(7) and (8) which authorize the partial distribution of property to those having an interest in such property.[2] In essence, the debtor seeks to

---

1. First Brandon relies solely on *In re Feely*, 93 B.R. 744 (Bankr.S.D.Ala.1988), to support its contention that eligibility is jurisdictional. *Feely*, albeit supportive of First Brandon's claim, is conclusory and thus unpersuasive.

2. Subsections (7) and (8) state that the plan may:

(7) provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor;

(8) provide for the sale of all or any part of the property of the estate or the distribution of all or any part of the property of the estate

transpose the permissive provisions of § 1222(b) on to § 1225(a)(5). The court finds this interpretation strained and hence refuses to follow it. Section 1222(b) is a general provision of Chapter 12 which merely states what plans *may* contain; it does not purport to override the specific limitations placed on it in § 1225(a)(5).

Section 1225(a)(5)(C) allows a plan to be confirmed without creditor consent if the plan provides that the "debtor surrenders the property securing such claim" to the creditor. The plain language of this provision compels the debtor to surrender the entire collateral to the creditor because the entire collateral and nothing less is the property which secures the claim. *In re Townsend*, 90 B.R. 498, 502 (Bankr.M.D. Fla.1988) (plan may be confirmed under § 1225(a)(5)(C) only if *all* the property securing the claim is surrendered to the creditor). If the debtor wishes to surrender less than all of the collateral in full satisfaction of her debt to a nonconsenting creditor, she should seek confirmation of the plan under § 1225(a)(5)(B)'s cram-down provision.[3] *See* R. Rogers, Collier Farm Bankruptcy Guide ¶ 4.08[2] (1989).

Furthermore, this interpretation of § 1225(a)(5)(C) dovetails cleanly with § 1225(a)(5)(B)'s cram-down provision. A creditor cannot legitimately complain when the entire collateral is surrendered pursuant to § 1225(a)(5)(C) because the secured claim originally bargained for is not greater than the value of the collateral. *See* 11 U.S.C. § 506(a). On the other hand, if less than all the collateral or other property is distributed to the most senior creditor in satisfaction of the debt without retention of the lien, the creditor might not realize the full amount of his original secured claim and thus, can genuinely claim that he is being discriminated against. Section 1225(a)(5)(B) protects against this unjust

result by allowing the creditor to retain a lien when its secured claim is satisfied by the distribution of anything less than all the property which secured the claim. The debtors interpretation of § 1225(a)(5)(C), however, would permit a reorganization plan to circumvent the protection § 1225(a)(5)(B) provides to creditors. The court cannot sanction such a incongruous result.

To the extent that *In re Massengill*, 73 B.R. 1008 (Bankr.E.D.N.C.1987), *rev'd on other grounds*, 100 B.R. 276 (E.D.N.C. 1988), or its progeny *In re Inderland*, 77 B.R. 268 (Bankr.D.Mont.1987), hold otherwise, the court declines to follow them. At least one commentator has criticized *Massengill* for authorizing a surrender of property under § 1225(a)(5)(C) when the proper mechanism was a cram-down under § 1225(a)(5)(B):

> The use of the word "surrender" implies that the debtor relinquishes control of the property to the secured creditor without any conditions. If the purported surrender of property under the plan involves mandatory concessions by the secured party, it is hardly a surrender of that property and should not be approved. For instance, if the debtor proposes to surrender a parcel of land to a secured creditor, but desires the property to constitute full satisfaction of the creditors claim, the debtor is not proposing a surrender. Rather, the debtor should seek confirmation under the cramdown alternative because the debtor is seeking more than simply surrendering the collateral. This point was overlooked by the court in *In re Massengill.*

R. Rogers, Collier Farm Bankruptcy Guide ¶ 4.08[2], at 4–90 (1989). In *In re Inderland* the court relied on *Massengill* and the permissive language of § 1222(b) to hold

---

among those having an interest in such property;

11 U.S.C. § 1222(b).

**3.** In *In re Durr*, 78 B.R. 221 (Bankr.D.S.D.1987), the court held that safeguards are necessary for distributing real property under § 1225(a)(5)(B). The court approves of these safeguards because they protect the creditor from shortfalls and the debtor from over-

payment. Accordingly, appropriate safeguards enable real property cram-downs—infamously known as "eat dirt" plans—to comply with § 1225(a)(5)(B). Nonetheless, the court does not believe *In re Durr* should be construed so rigidly as to preclude confirmation of Chapter 12 plans which provide adequate safeguards for cram-downs of real property.

that a partial distribution of the collateral was allowable under §§ 1225(a)(5)(B) or (C). 77 B.R. at 273. The court, however, apparently refused to retain the lien to guarantee that part of the obligation extinguished by the transfer; thus, it does not appear the court followed the procedure required by § 1225(a)(5)(B)(i). In addition, the *Inderland* court's alternative holding that, pursuant to § 1225(a)(5)(C), the secured claim was partially satisfied without the surrender of all the property securing the claim, is contrary to § 1225(a)(5)(C)'s express statutory language requiring that all of the property securing the claim be surrendered. *See In re Townsend*, 90 B.R. at 502. *Contra* J. Anderson & J. Morris, Chapter 12 Farm Reorganizations § 9.29 n. 359 (1989) (arguing that the "facial" meaning of § 1225(a)(5)(C) is not the proper interpretation).

While the debtor's interpretation of § 1225(a)(5)(C) arguably furthers Chapter 12's worthy aim of easing the plight of the family farmer, the Act's plain meaning mandates a different interpretation. Moreover, the debtor has not convinced the court that requiring her to distribute her property under § 1225(a)(5)(B) is necessarily detrimental to an effective reorganization plan. Lastly, Chapter 12's legislative history indicates that creditor rights were not to be cast aside. *See In re Durr*, 78 B.R. 221 (Bankr.D.S.D.1987) (citing 132 Cong.Rec. § 15,075 (daily ed. Oct. 3, 1986) (statement of Sen. Thurmond)). It is beyond the province of this court to rewrite the legislative compromises struck by Congress when it enacted Chapter 12. Accordingly, the bankruptcy court's confirmation of the plan is reversed.

## C. *Property Value Findings*

First Brandon contends that the bankruptcy court's factual conclusions of the land values in Bridport and Cornwall were clearly erroneous.[4] *See* Fed.R.Civ.P. 52(a). To satisfy the "clearly erroneous" standard

First Brandon must hoe a tough row: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Furthermore, "[t]he mere fact that on the same evidence the appellate court might have reached a different result does not justify it in setting the findings aside." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2585, at 732–33 (1971).

■ With this standard as a guidepost the court turns to the factual conclusions at issue. As to the Bridport property the bankruptcy court found that its fair market value was $615/acre. The bankruptcy court reached this finding by analyzing which comparables in the area best reflected the value of debtor's land. The court relied on expert witness testimony as well as the debtor's own testimony. This court cannot say the bankruptcy court's finding was clearly erroneous; therefore the value placed on the Bridport property is affirmed.

■ With regard to the bankruptcy court's valuation of the Cornwall property, however, the court must take issue with the form of its findings. The court placed a value of $2,700/acre on the 23 acres located in Cornwall. Specifically, the bankruptcy court concluded that it did not believe the value was the $4,000/acre indicated by at least one comparable nor did it believe that the property was worth as little as $1,500/acre exhibited by other comparables. Then, the court stated "what we're going to do hopefully like Solomon, is like split the baby and say that the value of the acreage on the Cornwall side is $2,700 an acre."

While this value may very well have sufficient support in the record, the form of

4. Arguably, the court need not address the remaining issues because the court has reversed the bankruptcy court's confirmation of the plan. Nonetheless, the bankruptcy court's holdings concerning the value of the property and allow-

ance of fees will no doubt significantly affect the preparation of a new plan; thus, in the interest of judicial economy, the court believes it is necessary to proceed.

the findings make it difficult to discern the court's basis for its conclusion. The bankruptcy court did not indicate why it was appropriate to average these comparables. The Supreme Court has stated that in order for the trial court's factual conclusions to withstand review "there must be findings ... which are sufficient to indicate the factual basis for the ultimate conclusion." *Kelly v. Everglades Drainage Dist.*, 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485 (1943); *see also* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2579, at 708–16 (1971). Moreover, Fed.R. Civ.P. 52(a) requires a court to "find the facts specially." Because sufficient findings are lacking to follow the steps by which the bankruptcy court reached this conclusion, it must be reversed. *See Russo v. Central School Dist. No. 1*, 469 F.2d 623 (1972) (findings of fact should aid appellate court on review), *cert. denied*, 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973).

### D. *Attorneys' Fees*

First Brandon contends that as an oversecured creditor the bankruptcy court should have allowed it to recover attorneys' fees and other costs. The Bankruptcy Code permits an oversecured creditor to recoup reasonable attorneys' fees and other costs if authorized under the agreement. 11 U.S.C. § 506(b). Here, however, the bankruptcy court held that the agreement only authorized attorneys' fees when the bank foreclosed; thus, the bankruptcy court concluded that because First Brandon had not foreclosed it was not entitled to attorneys' fees.

■ First Brandon claims that the following language of the security agreement entitles it to reasonable attorneys' fees:

DEFAULTS AND REMEDIES ... If I am in default on this agreement or on any secured obligation, you have all of the remedies provided in the note or other obligation and all of the remedies provided below and by law. You may:

. . . .

(b) take immediate possession of the property and sell, lease or dispose of it, as provided by law. You may apply the

proceeds of the disposition to your expenses (including costs of repossession, attorneys' fees (if permitted), repairs (if necessary) and costs of sale) and then to payment of the secured obligation.

First Brandon claims that subsection (b) clearly allows it to recover attorneys' fees. The debtor, however, points to another passage of the agreement which allows attorneys' fees to be recovered "in case this mortgage shall be foreclosed and a decree obtained." The bankruptcy court held that this passage restricted subsection (b) to the grant of attorneys' fees only upon foreclosure. Without reaching that issue, this court holds that subsection (b) standing alone does not authorize attorneys' fees in bankruptcy proceedings. Subsection (b) merely provides for taking possession of the property after default and applying the proceeds of the subsequent disposition to costs, including attorneys' fees. This is not what occurred here. Rather First Brandon was to receive the property pursuant to a reorganization plan approved of in a bankruptcy proceeding. Taking possession of the property upon default is not coextensive with taking possession through bankruptcy proceedings.

■ To be sure, to withstand a challenge, a security agreement need not authorize the recovery of attorneys' fees specifically in bankruptcy proceedings. Indeed, reference to "proceedings" or "actions" brought to collect the debt has been held to be sufficient. *See, e.g., In re Mills*, 77 B.R. 413, 417 (Bankr.S.D.N.Y.1987). Nonetheless, agreements which allow attorneys' fees only in foreclosure proceedings cannot be interpreted to authorize fees in bankruptcy proceedings. *In re Nickleberry*, 76 B.R. 413, 425 (Bankr.E.D.Pa. 1987).

In this case, the mortgage provision allowing attorneys' fees for the taking of immediate possession of property upon default and disposing of such property is analogous to a provision allowing a creditor to collect attorneys' fees in foreclosing the property. Indeed, under Vermont's strict foreclosure law, once the mortgagor has defaulted, the mortgagee may take immedi-

ate possession of the property provided he can do so peaceably. *See Rassman v. American Fidelity Co.*, 142 Vt. 623, 460 A.2d 461 (1983). Accordingly, because the parties' agreement effectively limits the grant of attorneys' fees to acts pertaining to foreclosure, it cannot be interpreted as authorizing attorneys' fees in bankruptcy proceedings; therefore, the bankruptcy court's holding on this issue is affirmed.

### E. *Appraisal Costs*

■ Lastly, First Brandon claims that it is entitled to its costs of appraisal pursuant to 11 U.S.C. § 503(b)(1)(A). That provision allows administrative expenses "including the actual, necessary costs and expenses of preserving the estate." It has been said that "[t]he granting of administrative priority under § 503(b)(1)(A) of Title 11 should only be granted under extraordinary circumstances, to wit, when the parties seeking priority have sustained their burden of demonstrating that their services are actual and necessary to preserve the estate." *In re AMFESCO Indus., Inc.*, 81 B.R. 777, 785 (Bankr.E.D.N.Y.1988).

First Brandon has not met this burden here. At best, First Brandon has shown that the appraisal costs incurred were necessary to preserve its own interest in the estate. Hence, the bankruptcy court's denial of appraisal costs is also affirmed.

### CONCLUSION

The bankruptcy court's decision confirming the plan under § 1225(a)(5)(C) is reversed. In addition, the court's finding as to the value of the Bridport property is affirmed while the finding with regard to the Cornwall property is reversed. Finally, the bankruptcy court's denial of attorneys' fees and appraisal costs is affirmed. The case is remanded to the bankruptcy court for proceedings consistent with this opinion. REVERSED IN PART, AFFIRMED IN PART, and REMANDED.

SO ORDERED.