In re Sharon E. KERWIN, Debtor,

**FIRST BRANDON NATIONAL BANK, Appellant,**

v.

**Sharon E. KERWIN, Jan M. Sensenich, Trustee, Appellees.**

No. 368, Docket 92–5045.

United States Court of Appeals, Second Circuit.

Argued Nov. 12, 1992.

Decided June 11, 1993.

James F. Carroll, Powers, English & Carroll, Ltd., Middlebury, VT, for appellant First Brandon Nat. Bank.

Gleb Glinka, Glinka & Palmer, Cabot, VT, for appellee Sharon E. Kerwin.

Jan M. Sensenich, pro se, Wilder, VT, for appellee Trustee.

Michael F. Crotty, Washington, D.C. (John J. Gill, American Bankers Assn, Washington, DC, of counsel), filed a brief on behalf of the American Bankers Assn as amicus curiae.

Before NEWMAN, CARDAMONE and MAHONEY, Circuit Judges.

CARDAMONE, Circuit Judge:

Sharon Kerwin is a farmer. She borrowed money from the First Brandon National Bank in Vermont, mortgaging her farm as collateral. Later, unable to carry the heavy debt load, she filed for chapter 12 bankruptcy protection and submitted a plan that would give the bank a portion of her farmland—which was appraised as of sufficient value—in full satisfaction of the bank's secured claim against her. The bankruptcy court approved the plan, and the district court affirmed, directing that the bank's lien on the property Kerwin retained be removed.

First Brandon National Bank appeals from that order of the Vermont District Court (Billings, J.), affirming the amended reorganization plan filed by the Chapter 12 debtor Sharon Kerwin, and approved by the Bankruptcy Court for the District of Vermont (Conrad, B.J.). The bank asserts that 11 U.S.C. § 1225(a)(5)(B)(i) requires the lien to be maintained on the remaining property or collateral retained by the debtor, and it further asserts that the bankruptcy court erred in valuing the property that was transferred to it.

The appeal raises an issue of first impression: whether a family farmer has a right in a Chapter 12 bankruptcy plan to satisfy fully an oversecured creditor by transferring a portion of the creditor's collateral determined to be equal in value to the outstanding debt; or whether the creditor is entitled to a transfer of all its collateral, and, if not, to have its security interest remain as a lien on the collateral the debtor retains, to secure against a deficiency when the creditor sells the property previously transferred to it.

The resolution of this question involves specific provisions of the Family Farmer Bankruptcy Act of 1986, 11 U.S.C. §§ 1201–1231 (1988) (Act). That Act added chapter 12 to the bankruptcy code in order to meet the special needs of family farmers facing bankruptcy and to give them an opportunity to downscale or otherwise reorganize so as to have a fighting chance to pull through. *See* H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess. 48 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5246, 5249 ("[Chapter 12] is designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land."). The Act sought at the same time to "ensur[e] that farm lenders receive a fair repayment." *Id.*

The chapter 12 provision implicated in the instant case, 11 U.S.C. § 1225(a)(5), seeks to further both objectives. Subsections 1225(a)(5)(B) and (C) facilitate a family farmer's reorganization by establishing conditions under which the bankruptcy court shall confirm the debtor's reorganization plan when a secured creditor has refused to consent to the plan. *See* § 1225(a)(5). Section 1225(a)(5)(C) provides for the "surrender" of the collateral to the secured lender. Section 1225(a)(5)(B)(ii) alternatively provides for the "distribut[ion]" of any property, including the collateral, over the course of the reorganization plan. Under this second option, § 1225(a)(5)(B)(i) offers protection to the lender by ensuring that the plan also provides "that the holder of such claim retain the lien securing such claim." *See* § 1225(a)(5)(B).

Upon careful analysis of the statute, we hold that because the completed transfer of property valued at or above the secured lender's claim fully satisfied that debt—regardless of whether the property transferred comprised only part and not all of the collateral—the lien requirement of § 1225(a)(5)(B)(i) must be deemed satisfied. This follows because however much protection a lien is entitled to under § 1225(a)(5), it does not continue in existence after the creditor's oversecured claim is satisfied by the transfer of property to it of equal or greater value. In short, when the claim is satisfied the lien securing it is extinguished too, for nothing remains for it to secure. In addition, because adequate grounds supported the bankruptcy court's valuation of the distributed farm land, we affirm the district court's

order upholding its valuation of that property. We turn to the facts.

## BACKGROUND

Sharon Kerwin, a life-long farmer, and her former husband purchased a farm located partly in the town of Bridport and partly in the town of Cornwall, Vermont, on June 20, 1985 for $110,000. The property included a house, a barn and roughly 135 contiguous acres of land in the two towns on which Kerwin and her husband attempted to operate a dairy farm. The farm encountered financial difficulties, and the cattle and dairy equipment were auctioned off. In 1988 the couple separated, and they later were divorced. Ms. Kerwin then tried to run a small sheep farm on the property. When unable to carry the debts inherited from the dairy operation, she filed a Chapter 12 bankruptcy petition on August 3, 1988 to try and save her farm.

The First Brandon National Bank as of February 27, 1989 had loaned Kerwin funds for her farming operations totalling $84,-600.64, secured by a first mortgage on her real and personal property. As part of her Chapter 12 proceeding she filed a bankruptcy reorganization plan on December 13, 1988 that provided for the bank to receive 105 acres of her farmland located in the town of Bridport in full satisfaction of its claim. The bank objected to this plan because its expert, Justus J. Devries, was of the opinion that the Bridport property was only worth $420 per acre and the property situated in the town of Cornwall was worth only $450 to $650 per acre, depending on its use. The bankruptcy judge found the Bridport land was worth $615 per acre for a total value of $69,495. Because that amount fell short of First Brandon's claim, Judge Conrad ordered Kerwin to provide the bank with additional land from the Cornwall parcel to satisfy the bank's claim.

On March 1, 1989 the debtor filed a revised reorganization plan providing now for the transfer of some of the Cornwall property in addition to all of the Bridport property. The plan referred to the additional Cornwall property as "valued at $2,700 an acre." Judge Conrad concurred in the $2,700 per acre valuation and confirmed the plan in a March 31, 1989 order. Within a few months, Kerwin presented the bank with a warranty deed for 125.06 acres of property that included all 119.8 acres of the Bridport property and 5.26 acres of the Cornwall property, and retained 10 acres for sheep farming. The bankruptcy court did not require a continuing lien on the retained 10 acres in favor of the bank.

When the bank appealed, the district court reversed in part and remanded for further proceedings. *First Brandon Nat'l Bank v. Kerwin–White*, 109 B.R. 626, 633 (D.Vt.1990). Judge Billings specifically found that because property had been "distributed" pursuant to § 1225(a)(5)(B)(ii), § 1225(a)(5)(B)(i) required Kerwin to allow First Brandon to retain its lien on the remaining collateral to secure any deficiency in the amount of its claim. 109 B.R. at 631. The district court affirmed the valuation of the Bridport property, but reversed as to the Cornwall parcel's valuation on the grounds that the bankruptcy court had failed to make findings in support of its valuation. *Id.* at 632. The matter was therefore remanded to permit Kerwin to file a revised reorganization plan consistent with the district court's opinion.

On remand, Kerwin filed a motion to modify her reorganization plan to provide that the bank would retain its lien on the remaining property as security for any deficiency. On June 21, 1990 Judge Conrad issued a new valuation order reducing the value of the Cornwall property to $2,100 per acre. Under this valuation, the amount of property transferred to the bank still was at least equal to the amount owed it. Judge Conrad issued final approval of the amended reorganization on June 10, 1991. *In re Kerwin–White*, 129 B.R. 375 (Bankr.D.Vt.1991). In doing so, he acceded to the district court's direction that a lien be imposed upon the ten acres retained by Kerwin in favor of First Brandon, but contended in a lengthy footnote that the district court had erred in imposing this requirement. *Id.* at 378 n. 9.

On a second appeal to the district court, First Brandon raised a number of arguments, one of which was that the district

court's earlier remand had required a new confirmation/valuation hearing and that the bankruptcy court's valuation of the Cornwall property without such hearing was clearly erroneous. On May 5, 1992 the district court affirmed the amended reorganization plan in full. In a reversal of its earlier position regarding § 1225(a)(5)(B)(i), the district court directed the bankruptcy court to remove the lien on the property remaining in the debtor's hands to which the district court had previously ruled the bank was entitled. This appeal followed.

## DISCUSSION

### I

Under the Chapter 12 plan the debtor turned over 125 acres of land valued by the bankruptcy court as equal to the debt owed the bank, and kept the remaining ten acres free of the bank's lien. The bank insists that under the statute the plan must provide that when the debtor distributes property, the bank as holder of a secured claim *either* retains a lien on the portion that the debtor retains *or* obtains the property securing such lien, that is, it should get all of the debtor's property, not merely some portion of it. The American Bankers Association supported First Brandon's position in an amicus curiae brief. Under the district court's order, the bank argues, it is forced into the land speculation business, taking a loss or a profit when it sells. And, so the argument runs, because commercial banks are in the lending business, they are entitled to be paid the principal and interest on the loans they make: not one penny less and not one penny more.

■ The novel issue raised is whether the lien must be maintained on the bank's remaining collateral in Kerwin's possession. Although this issue presents a close question of statutory construction, not previously directly addressed, we believe that because the bank's claim was fully satisfied by the debtor's completed distribution of property at least equal to the value of the bank's claim, § 1225(a)(5)(B)(i) does not require that a lien be maintained on the remaining ten acres of the debtor's land in Cornwall. We reason that any lien existing is satisfied upon the ordered distribution under the reorganization plan of the property to the bank.

The bank's response is that the "plain language" of § 1225(a)(5)(B)(i) requires such a lien. Section 1225(a)(5) provides in relevant part,

... the court shall confirm a plan if ... with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder....

11 U.S.C. § 1225(a)(5). First Brandon declares that under the language of the statute, where a creditor does not consent to the plan under (A) then the debtor must either surrender the entire collateral to the non-consenting creditor, following § 1225(a)(5)(C), or the debtor must provide that creditor with an appropriate distribution and a lien pursuant to § 1225(a)(5)(B).

### A. *Surrender of Collateral Under (C) Versus Distribution under (B)*

■ The plain meaning of the language Congress used in a statute ordinarily is conclusive, except in the rare case where a literal reading defeats the drafter's aim in enacting the legislation. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). Unfortunately, Congress' aim in enacting this legislation does not like a flash of lightning readily reveal itself. Instead, in construing this statute we painstakingly must examine its language and purpose in light of the competing interests of small farmers who borrow money and the institutions that loan to them.

■ We begin by agreeing with the bank's contention, and disagreeing with the district court, that "the property securing such

claim" in (C) refers to all the debtor's collateral and that a transfer of only part of the collateral cannot be accomplished through that section. *Accord In re Townsend,* 90 B.R. 498, 502 (Bankr.M.D.Fla.1988) (transfer of less than all property securing claim did not comply with § 1225(a)(5)(C)); *In re Graham,* 123 B.R. 330, 332 (Bankr.W.D.Mo.1990) (partial transfer of collateral did not comply with similar provision 11 U.S.C. § 1325(a)(5)(C)). Subsection (C) allows a debtor to *surrender* the collateral to a secured creditor and carries different implications than a *distribution* of property under subsection (B).

When the debtor elects to surrender the collateral under (C), the secured creditor takes possession of the property and sells it in accordance with non-bankruptcy law. If a sale produces a deficiency, the creditor may assert the amount of such deficiency as an unsecured claim against the debtor's remaining assets. *See* 5 King, *Collier on Bankruptcy* ¶ 1225.03, at 1225–27 (15th ed. 1992). Thus, even a creditor who receives its entire collateral under (C) is not guaranteed its claim will be satisfied to the last penny because any outstanding deficiency will, upon liquidation of the estate, entitle the creditor only to its *pro rata* share of those payments made to all unsecured creditors. *Id.* Additionally, if the sale produces a surplus, the creditor must pay the surplus to holders of junior liens or return the excess to the debtor. *Id.* Thus, the debtor can ensure that, should the value of the collateral surrendered exceed the creditor's allowed secured claim, the excess will benefit other creditors or the debtor.

■ In contrast, under a (B) distribution of property a creditor's claim may be deemed fully satisfied provided the property "to be distributed" has been valued as at least equal to the amount of that claim. 11 U.S.C. § 1225(a)(5)(B)(ii); *In re Townsend,* 90 B.R. at 502. Following a (B) distribution, the bankruptcy court ceases to be concerned with whether the transferred property is held or sold or what amount such sale brings. Although (B)(i) provides in those circumstances that a lien be maintained on the collateral, the lien does not guarantee what price the transferred property will bring upon ultimate sale. The (B)(i) lien only guarantees that the transfer is completed in accordance with the reorganization plan. A (B) distribution—quite distinct from a (C) surrender—provides that so long as the plan is carried out as approved, a creditor may not assert any deficiencies that may result when it sells the distributed property, nor need the creditor return any surplus.

Section (C) becomes a particularly appropriate vehicle for discharging debt where a debtor possesses collateral which, after reorganization, she or he no longer intends to use, and where such collateral is discrete and easily separated from the debtor's remaining property. Such would be the case if, for example, the collateral was a particular piece of farm equipment a farmer no longer needed. In that situation section (C) facilitates the transfer of collateral without the expenditure of time, money and the judicial resources required to revalue the collateral as of the effective date of the plan. But a section (C) surrender would not facilitate reorganization in Kerwin's case because to surrender the collateral would be to surrender the entire farm, thus destroying the point of a chapter 12 reorganization, which is after all to afford a farmer flexibility and a number of options to facilitate the family farmer's reorganization, in this case on a smaller scale.

Particularly given the different implications of and reasons for a (C) *surrender* versus a (B) *distribution* of property, we read "the property securing such claim" in (C) as referring to the entire collateral. Section 1225(a)(5)(C) accordingly does not provide an appropriate basis on which the bankruptcy court could have confirmed the plan's provision for the distribution of part of Kerwin's farm. It follows therefore that such a transfer could only have been effected under (B).

### B. *Property "To Be Distributed" Under (B)*

While the "property to be distributed" referred to in (B)(ii) is undefined in the statute, the most sensible interpretation of this phrase is any property, including the collateral. Thus, a (B) distribution could include

property that was part or all of the collateral so long as the property to be transferred to the creditor was valued as at least equal to the amount of the creditor's claim. *See* 11 U.S.C. § 1225(a)(5)(B)(ii).

Although the statute does not define "property," the use of that term suggests an expansive understanding of what may be transferred in satisfaction of a secured creditor's claim. Bankruptcy courts considering its scope under § 1225(a)(5)(B) and its legislative model, § 1325(a)(5)(B), universally recognize that the term includes cash and all other types of property. *See, e.g., In re Lairmore,* 101 B.R. 681, 683 (Bankr. E.D.Okla.1988) ("No legal obstacle or bar exists to the substitution of property in lieu of cash payments or in lieu of the collateral under Chapter 12."); *In re Durr,* 78 B.R. 221, 223 (Bankr.D.S.D.1987) (same); *In re Stockwell,* 33 B.R. 303, 305 (Bankr.D.Or. 1983) (property under § 1325(a)(5)(B) "sufficiently broad to include cash or any other type of property").

Further, in legal parlance "property" is "used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal" and "extends to every species of valuable right and interest." Black's *Law Dictionary* 1382 (4th ed. 1968). All indications point to the usual broad range the word property encompasses as part of the scheme under § 1225(a)(5)(B). *See also* Rogers & King, *Collier Farm Bankruptcy Guide* ¶ 4.08[2][d], at 4–114 (1992) ("The reference to property rather than to cash payments [in chapter 12] implies that payment may be made in kind rather than in cash."); *cf.* 5 King, *Collier on Bankruptcy, supra,* ¶ 1325.06, at 1325–43 ("'Property' [under identical § 1325(a)(5)(B) in chapter 13] is not a defined term, but it is altogether unrestricted in scope and unquestionably encompasses any and all kinds of property of the estate and property of the debtor 'to be distributed under the plan.'").

Absent any evidence that Congress—in an otherwise flexible reorganization scheme—sought to restrict what property could be transferred under § 1225(a)(5)(B), we are unwilling to read narrowly its broad language to restrict the usual expansive understanding comprised by the term "property." Congress referred simply to property, not limiting it solely to payments to be made or equipment to be distributed under the plan. Consequently, we construe "property to be distributed" under (B) as any property to be transferred under the plan, other than a full "surrender" of collateral undertaken pursuant to (C).

Moreover, there is no good reason to draw a fine distinction between whether or not the property distributed included the collateral. It would unnecessarily complicate the bankruptcy statutes for us to rule irrationally that a distribution of a virtually identical parcel of property could be permitted under (B) if it was not part of the collateral—for example, were Kerwin to own a similar adjoining farm that was not part of the bank's collateral—but that a transfer would not be allowed under (B) if all or part of the property to be transferred were originally part of the collateral.

Reading (C) as providing the alternative of permitting a debtor to surrender the entire collateral does not render the two subsections redundant. Rather, the two provisions grant a debtor several options in structuring a reorganization plan by providing different means of dealing with a secured claim when the creditor refuses to consent to the plan as provided in § 1225(a)(5)(A). Depending on the circumstances of a given case, one or the other alternative, either subsection (B) or (C), for disposing of the debtor's property doubtless will be more practical.

### C.  *Lien Requirement Under (B)(i)*

■ The core question that remains must then be answered: under what conditions may (B)(i)'s lien requirement be met. The (B)(i) lien provision seeks to protect the secured creditor by ensuring that the property to be distributed actually is transferred according to the reorganization plan. Subsection (B)'s future-oriented language particularly suggests that the lien requirement applies to distributions to be made throughout the entire course of the reorganization plan. *See* 11 U.S.C. § 1225(a)(5)(B)(ii) (referring to valuation of property "to be distributed" un-

der the plan); *In re Hanna,* 912 F.2d 945, 951 (8th Cir.1990) ("The lien ... will not suffice to meet Chapter 12's lien retention requirement if it fails to adequately protect the creditor's secured claim *over the course of the plan repayment period.*") (emphasis added); 5 King, *Collier on Bankruptcy, supra,* ¶ 1325.06, at 1325–40 ("The practical effect of requiring a lien retention provision in the plan is to protect the holder of an allowed secured claim from loss occasioned by a later failure on the part of the debtor to complete the proposed plan....").

Secured lenders in this and similar cases receive their primary protection through the valuation process. When distributions occur under (B), the property is valued by the bankruptcy court as of the effective date of the plan and must be found to be "not less than the allowed amount of [the secured lender's] claim." *See* § 1225(A)(5)(B)(ii). The language in (B)(i) relating to a holder retaining its lien guarantees that distribution is carried out under the plan. It does not guarantee any ultimate sale price of property. The guarantee that the secured creditor will receive the full value of its claim is provided by § 1225(a)(5)(B)(ii)'s requirement that the property to be distributed be valued at the amount of the creditor's claim. In that way the statutory scheme protects the secured creditor mainly through the valuation process.

We acknowledge that in some cases the property sought to be distributed under (B) may be so difficult to value that it may not be transferred under (B) because (B)(ii)'s valuation requirement could not be met. Kerwin's property does not present that problem. Although valuing real property is not an exact science, it is a chore performed satisfactorily by professionals on a daily basis. Here the record expressly reveals a good bit of evidence that adequately supports the transfer valuation.

Where property is to be distributed throughout a reorganization plan, (B)(i)'s lien requirement, as noted, protects the lender only to the extent that it ensures that the debtor completes the plan. Despite the seemingly mandatory language of (B)(i), stating that the plan shall be confirmed if "the plan provides that the holder of such claim retain the lien securing such claim," § 1225(a)(5)(B)(i), the lien will be satisfied when the property to be distributed under the plan actually is distributed. *See In re Lairmore,* 101 B.R. at 684; *In re Durr,* 78 B.R. at 222. In the case of periodic monetary payments to be made under a plan, for example, the lien does not exist beyond the payment period because the claim will have been fully satisfied by payment as provided in the plan. This remains true even if the value of the payments was actually less than anticipated at the time of valuation, perhaps due, for instance, to interest rate fluctuations, though to protect against this possibility, various protections have been put in place, including variable interest rates. *See In re Patterson,* 86 B.R. 226, 229 (Bankr. 9th Cir.1988).

In the instant case, because distribution of the entire property "to be distributed" to the bank occurred upon confirmation of the plan—at which point the bank held title to the property—the lien requirement was satisfied by full transfer of all the property "to be distributed." Our view that the lien exists only until the claim is deemed satisfied furthers the policy that all the parties agree underlies chapter 12—to give family farmers facing bankruptcy a chance to reorganize their debts and keep their land. *See* H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess. 48 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5246, 5249. The statutory reading we adopt also fits with other provisions of chapter 12— for instance, § 1222(b)(7) and (8)—which provide for payments of claims from the debtor's property, 11 U.S.C. § 1222(b)(7), and for the distribution or sale of "all or any part of the property," 11 U.S.C. § 1222(b)(8).

Moreover, while § 1225's legislative history is quite sparse, the legislative history of § 1325—on which § 1225 was patterned— supports allowing the transfer while finding the lien requirement satisfied. Congress based chapter 12 on chapter 13 in order to provide a bankruptcy process for family farmers similar to that available under chapter 13. *See* H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess. 48 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5246, 5249 ("This new chapter

is closely modeled after existing Chapter 13."). Significantly, 11 U.S.C. § 1325(a)(5) in chapter 13 contains language identical to that in § 1225(a)(5). Legislators' statements accompanying § 1325's adoption pointedly noted, "Of course, the secured creditors' lien only secures the value of the collateral and to the extent property is distributed of a present value equal to the allowed amount of the creditor's secured claim the creditor's lien will have been satisfied in full." *See* 11 U.S.C.A. § 1325 West 1979, Historical and Revision Notes, Legislative Statements. This construction applies equally to § 1225(a)(5)(B) and we adopt it for § 1225(a)(5)(B) in order to provide a consistent construction of a statutory provision that is far removed from the crystal-clear category.

## II

■ First Brandon's remaining contention is that even if a lien on the remaining collateral was not required after completion of the distribution, the bankruptcy court committed clear error in valuing the Cornwall property. Because appellant does not challenge the valuation of the Bridport portion of the property transferred, we are concerned only with the roughly five acres of Cornwall property valued by the court at $2,100 per acre. No one disputes that the bankruptcy court's valuation comprises a finding of fact subject to review under the clearly erroneous standard. *See* Fed.R.Bankr.P. 8013.

The bankruptcy court, the bank alleges, erred in a number of respects: (1) it had no basis on which to reach a conclusion different from that reached by the bank's appraiser, Mr. Devries, (2) the disparity in values it found between the contiguous Bridport and Cornwall properties was wrong, and (3) the portion of the Cornwall property actually transferred did not contain some of the elements the bank believes were incorporated in the district court's valuation.

Determining the market value of real property is a constant feature in today's commercial world. Such valuations are regularly used by prudent lenders, like the bank, to make business decisions. Although at least one bankruptcy court has found the transfer

of a specific parcel of real estate could not satisfy § 1225(a)(5)(B)(ii)'s requirement that it at least equal in value the amount of the claim because the value of the land was too speculative, *see In re Durr*, 78 B.R. at 224, that does not mean that the valuation of real property will very often be too speculative to provide sufficient safeguards to the debtor or that (B)(ii)'s requirements may not ordinarily be met in the valuation of real property.

Instead, the valuation of property to be distributed under a reorganization plan must be undertaken on a case by case basis, taking account of the particular property and the circumstances of each case. *See In re Owens*, 120 B.R. 487, 489–90 (Bankr.E.D.Ark. 1990). An estate might exist where real property simply could not be transferred in a reorganization plan because the property's value was so speculative the bankruptcy court could not be assured that it was worth "not less than the allowed amount of [the] claim" as required by 11 U.S.C. § 1225(a)(5)(B)(ii). *Cf. In re Graham*, 123 B.R. at 332–33 (chapter 13 plan did not comply with analogous (B) provision where value of pro rata portion of closely held corporation's stock to be transferred not clearly established).

But the property in this case was capable of valuation by the bankruptcy court. The evidence showed sufficient activity in the local real estate market to make Sharon Kerwin's property susceptible to evaluation. The record includes detailed proof concerning a number of comparable sales in the same county, which the bank's appraiser discussed at length. Cross-examination by Kerwin's counsel further revealed other sales of Cornwall property, which were even closer to Kerwin's farm, but ones that the appraiser had omitted from his report.

The actual value fixed by the bankruptcy court was not clearly erroneous. First Brandon disingenuously asserts that the only evidence of valuation on the record were the figures in Devries' appraisal. On the contrary, the record included property valuation records from the Town of Cornwall and the State of Vermont and evidence concerning the market values of property in relation to their appraised values for property tax purposes. Devries' testimony makes up over

100 pages in the transcript and includes a great deal of testimony on the methods of valuing land. Proof reflected the better soil quality of the Cornwall property compared with the flood-prone property in the Bridport section, and showed the Cornwall parcel had a greater potential for development.

Devries' cross-examination revealed that he conducted his appraisal after the bank sent him Kerwin's reorganization plan, suggesting that he knew beforehand the valuation he was to make, that he had excluded some comparable property from his appraisal, and that there were flaws in his computations made on the witness stand when he compared the richer, tillable Cornwall parcel to the flood plain land in the Bridport parcel. The trial court expressed skepticism of Devries' credibility and declined to adopt his conclusions. As the fact-finder such is its role.

Instead of blindly relying on Devries' conclusions, the trial court critically examined the evidence on which Devries relied. In support of the bankruptcy court's increased valuation of the Cornwall property in relation to the Bridport property, Devries testified on March 1, 1989, "[t]he superior soils are on the Cornwall side . . . ." He also agreed that the Cornwall parcel, unlike the Bridport parcel, contained land with "development potential."

There is no merit to the bank's declaration that the bankruptcy court failed to account for the fact that the house and barn were not on that part of the Cornwall property actually transferred. It had an opportunity to argue these differences. More important, the trial court's opinion shows that it subtracted the value of Kerwin's buildings from the Cornwall parcel before arriving at its per acre valuation. Thus, adequate reasons support the $2,100 valuation of the Cornwall parcel sufficient for us to say that the valuation was not clearly erroneous. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

■ Finally, First Brandon avers that the bankruptcy court acted in an arbitrary and capricious manner in not granting its request for another valuation hearing—after remand from the district court—in order to value the distributed property "as of the effective date of the plan," required by § 1225(a)(5)(B)(ii). The bank believes the evidence adduced as to valuation at the original bankruptcy court hearing was too outdated to support that court's findings on remand.

The effective date of Kerwin's plan defines the "effective date" as: "the first day of the month after thirty (30) days from the date that the [o]rder confirming the Plan becomes final and no longer subject to appeal." The valuation hearing must take place in advance of the effective date of the plan, that is, the bankruptcy court's valuation necessarily has to be somewhat forward-looking. While we need not decide when evidence is so outdated that reliance on it would make a court's findings clearly erroneous, on the facts in the instant record the bankruptcy court did not wrongly rely on the evidence it had heard earlier. It carefully considered the parties' arguments with respect to whether circumstances had changed to such a degree as to require a new valuation hearing. It found that they had not and that a *de novo* hearing on this issue was therefore unnecessary. We decline to disturb this exercise of the bankruptcy court's discretion.

## CONCLUSION

The judgment of the district court is accordingly affirmed.