In re RACK ENGINEERING
COMPANY, Debtor.

FREMONT FINANCIAL
CORPORATION,
Plaintiff,

v.

Carl IZZO, Chapter 7 Trustee for Rack Engineering Company, and Eckert, Seamans Cherin & Mellott, Defendants.

Bankruptcy No. 93–23127–MBM.
Adversary No. 97–2269.

United States Bankruptcy Court,
W.D. Pennsylvania.

Aug. 25, 1997.

99

Stephen J. Laidhold, Pittsburgh, PA, for Fremont Financial Corp.

Thomas D. Maxson, Pittsburgh, PA, for Rack Engineering Company.

Carl P. Izzo, Greensburg, PA, for Carl Izzo, Chapter 7 Trustee.

## MEMORANDUM OPINION

M. BRUCE McCULLOUGH, Bankruptcy Judge.

Fremont Financial Corporation (Fremont), plaintiff herein, commenced this proceeding to effect a turnover of $52,584.43 from Carl Izzo, the Chapter 7 trustee in this case and defendant herein. The amount sought by Fremont represents proceeds from accounts receivable of the debtor that the trustee had collected post-petition and which were subject to Fremont's perfected security interest. Fremont also named as a defendant herein Eckert, Seamans, Cherin & Mellott (Eckert), counsel for the debtor herein, seeking sanctions against Eckert for purportedly having asserted a claim against the same proceeds pursuant to 11 U.S.C. § 506(c). Eckert, in addition to raising several objections on behalf of the debtor to Fremont's request for turnover of the proceeds, (a) moved for dismissal of that portion of Fremont's complaint that sought sanctions against Eckert, and (b) sought sanctions against Fremont for having named Eckert as a defendant herein because Eckert had not yet actually filed a § 506(c) request with the Court. The trustee, pursuant to 11 U.S.C. § 506(c), requested that he be allowed to charge the aforementioned proceeds in the amount of $6,697.26 as recovery for fees and expenses that he had incurred in liquidating said proceeds. This Court, by separate orders dated August 14, 1997, and August 15, 1997, and after notice and a hearing held on August 14, 1997, (a) **GRANTED** the trustee's request for his § 506(c) charge of $6,697.26 against the proceeds, (b) **DIRECTED** the trustee to forward to Fremont the residual balance of the proceeds, or $45,-887.17, (c) **DISALLOWED** Fremont's request for sanctions against Eckert, and (d) **DENIED** Eckert's motion to dismiss, as well as Eckert's request for sanctions against Fremont.

■ This memorandum opinion sets forth in detail the basis for that part of the Court's decision directing the trustee to turn over to Fremont $45,887.17. The remaining parts of the Court's decision can be summarily justified as follows:

(a) Fremont stipulated that the trustee's § 506(c) claim was appropriate both in nature and amount, and Eckert failed to object to said claim. The Court also viewed the trustee's § 506(c) claim as appropriate;

(b) Fremont's request for sanctions against Eckert was disallowed because, although Fremont alleged that Eckert had inappropriately asserted a § 506(c) claim, no such claim had actually been filed by Eckert prior to August 14, 1997, despite Eckert's statement at a hearing on July 17, 1997, that it would file such a claim;

(c) Eckert's motion to dismiss that part of Fremont's claim that sought sanctions against Eckert was denied as moot in light of this Court's decision to disallow that particular portion of Fremont's requested relief; and

(d) Eckert's request for sanctions against Fremont was denied because (i) Fremont reasonably operated under the presumption that Eckert had legally asserted a § 506(c) claim given the language contained in a February 27, 1997 letter from

the trustee to Fremont's counsel, and (ii) Fremont had a legal basis for challenging said claim if it had actually been filed.

## STATEMENT OF FACTS

Subsequent to conversion of this case from Chapter 11 to Chapter 7 on October 16, 1996, Fremont sought abandonment of the debtor's machinery, equipment, and inventory, which property Fremont asserted was fully encumbered by its perfected security interest therein. At the hearing on February 11, 1997, regarding Fremont's request for abandonment, Fremont indicated to everyone present that it intended to directly sell the property to Harry Davis & Company (Davis), an auctioneer, for $201,555.00 rather than to conduct an auction sale of the property itself. The debtor, after initially objecting to an abandonment of the property, withdrew its objection thereto on the condition that said property ultimately be subjected to an auction sale by Davis. The Court entered an order on February 11, 1997, approving abandonment of the property to Fremont, as well as Fremont's proposed sale of the same property to Davis, with the condition that Davis dispose of the property by subsequent auction sale. Sometime shortly after the hearing on February 11, 1997, Fremont accepted Davis' offer for a direct purchase of the property; however, Davis reduced the purchase price to $198,000.00 for adjustments due to reinspection and verification of the property subsequent to Davis' initial offer. Davis ultimately sold the property at a public auction on May 1, 1997, receiving gross proceeds of $319,239.25 against costs of $53,350.24. The trustee received advance notification of this sale, as well as an accounting of the proceeds and expenses, which accounting was required by this Court pursuant to its February 11, 1997 order. The debtor, however, did not receive advance notification of Davis' auction sale. The debtor subsequently objected to Fremont's request for turnover of the $45,887.17 because, according to the debtor, Fremont's deficiency claim against the bankruptcy estate had been extinguished by Fremont's failure to notify the debtor in advance of Davis' auction sale. For several reasons to be set forth below, however, the Court disagrees with this contention of the debtor.

The debtor also asserted in its answer that Fremont had failed to properly reduce the principal portion of its claim for approximately $150,000.00 in post-petition adequate protection payments that had been made by the debtor. Because of such failure the debtor asserted that Fremont should not be entitled to receive the $45,887.17 in proceeds held by the trustee. The Court also disagrees with this contention of the debtor. Facts that were pertinent to the Court's decision in this regard, and which are part of the record in this case dating back to its inception in 1993, follow:

(a) According to the debtor's Bankruptcy Schedule D, the value of Fremont's claim on the commencement date of this case was $441,689.62. Also according to Schedule D, said claim was fully secured by a lien on property valued by the debtor at approximately $1,383,339.00. The debtor's Bankruptcy Schedule B ascribes values to its equipment, machinery, and inventory of $168,000.00, $593,000.00, and $350,000.00, respectively.

(b) In several pleadings filed with the Court as early as September 9, 1993, Fremont asserted that the true value of the debtor's equipment and machinery was approximately $320,000, and that of its inventory was approximately $50,000.

(c) On November 24, 1993, Bankruptcy Judge Warren Bentz, who presided over this case until its subsequent transfer into this Court, authorized the debtor's use of Fremont's cash collateral without imposition of adequate protection payments, presumably because Fremont appeared to be substantially oversecured at the time.

(d) Notwithstanding Fremont's apparent oversecured position, the debtor and Fremont entered into an agreement on August 2, 1994, whereby the debtor agreed to provide additional adequate protection to Fremont in the form of monthly payments equivalent in amount to the interest charge assessed by Fremont on its outstanding pre-petition claim. As represented in the parties' stipulation re-

garding said agreement, the debtor had not made any payments to Fremont between the commencement of this case and the date of the agreement. Judge Bentz approved the agreement by order dated August 11, 1994.

### DISCUSSION

**I. Whether Fremont's deficiency claim against the bankruptcy estate was extinguished by Fremont's failure to notify the debtor in advance of Davis' auction sale?**

Since the debtor's machinery, equipment, and inventory was abandoned to Fremont, Fremont needed to dispose of said collateral in accordance with 13 Pa.Cons.Stat.Ann. § 9504(c). Section 9504(c) generally requires that (a) "reasonable notification of the time and place of any public sale[,] or reasonable notification of the time after which any private sale or other intended disposition is to be made[,] shall be sent by the secured party to the debtor," and (b) "every aspect of the disposition[,] including the method, manner, time, place and terms[,] must be commercially reasonable." 13 Pa.C.S.A. § 9504(c) (Purdon's 1984). By not notifying the debtor in advance of Davis' sale, the debtor concluded that Fremont had failed to comply with the notification requirement of § 9504(c) set out above. This conclusion is flawed for several

reasons, however, not the least of which is that it exhibits a profound lack of practical common sense.

First, the sale of the property in question herein which required notification under § 9504(c) was that which Fremont made directly to Davis prior to Davis' subsequent auction sale because (a) § 9504(c), by its express terms, only regulates the sale by a creditor of collateral and not sales by subsequent purchasers, *Id.*, and (b) the property in question herein did not constitute collateral after Fremont had sold it to Davis (ie., Davis was a subsequent purchaser).[1] Therefore, it technically matters not that the debtor did not receive advance notification of Davis' auction sale.[2] Furthermore, the debtor received actual notification at the hearing on February 11, 1997, that Fremont intended to dispose of the collateral directly to Davis shortly after said hearing, and said disposition was ultimately consummated in the same fashion as set forth at the hearing. This notification satisfies § 9504(c) because (a) a person receives a notice or notification "when ... it comes to his attention," 13 Pa.C.S.A. § 1201 (Purdon's 1984), (b) notification as required under § 9504(c), therefore, can be effected in person at a meeting of creditors and the debtor, *Reuter v. Citizens & Northern Bank*, 410 Pa.Super. 199, 599 A.2d 673, 678–79 (1991),[3] and (c) Fremont and the

1. Upon consideration of the debtor's brief, it appears to the Court that the debtor's counsel may have operated under the presumption that the Court, by virtue of its February 11, 1997 order, directed Davis to conduct an auction sale of the property while it still constituted collateral to Fremont (ie., while the debtor and the bankruptcy estate still had rights in the property). This presumption is incorrect, however, as the Court (a) merely ordered, as a condition for its approval of Fremont's abandonment request, that the property ultimately be subjected to an auction sale by Davis, *not that said auction also be conducted while the property still constituted collateral to Fremont*, and (b) approved Fremont's proposed direct sale to Davis with the aforementioned condition. This interpretation by the Court of its February 11, 1997 order is consistent with, and confirmed by the Court's review of a tape recording of, the hearing on February 11, 1997, which hearing culminated in said order. Of particular importance, the Court notes that the debtor's counsel, at the hearing on February 11, 1997, acknowledged itself that (a) Fremont proposed to directly sell the property to

Davis prior to a subsequent auction sale by Davis, (b) Fremont's proposal would divest Fremont, as well as the debtor and/or the bankruptcy estate, of rights in the property at the point of the direct sale to Davis, and (c) the Court was approving Fremont's proposal subject to the condition that Davis subsequently dispose of the property by auction sale with a full accounting to the trustee and the Court. The accounting was provided and is a matter of record.

2. Because the property no longer constituted collateral after Davis had purchased it from Fremont, it also follows that neither Fremont nor the debtor had any right to object to any aspect of Davis' auction sale provided, of course, that Davis complied with the few restrictions placed upon it by the Court in the order dated February 11, 1997.

3. This Court strongly disagrees with the debtor's counsel's assertion in its brief that "the debtor/creditor relationship and the context of the 'notice' in Reuter are completely inapposite to

debtor were both present at the hearing in this Court on February 11, 1997, when said notification was conveyed.

■ Second, although § 9504(c) requires that notification be sent to the debtor, the Chapter 7 trustee rather than the debtor is the proper party upon whom such notification should be served in the context of a Chapter 7 bankruptcy case involving a corporate debtor. This is because the purpose of said notification is to (a) advise the debtor of the termination of his title and his right to redemption, and (b) ensure the debtor as to the propriety of any deficiency claim that may ultimately be asserted against it. *In re Koresko*, 91 B.R. 689, 698 (Bankr.E.D.Pa. 1988). However, a corporate debtor's redemption right is meaningless in the context of a Chapter 7 abandonment because (a) the trustee obviously does not wish to bid on the property as evidenced by its decision to abandon, and (b) the corporate debtor is defunct following a Chapter 7 liquidation. Furthermore, and most importantly, because any deficiency claim by a foreclosing creditor will be asserted against the bankruptcy estate in a Chapter 7 case, the trustee instead of the debtor will be the entity concerned as to the propriety of any such deficiency.[4] Therefore, although Fremont did not need to

technically notify anyone as to Davis' subsequent auction sale, if Fremont did need to do so *arguendo*, such notification only needed to be served upon the trustee and not the debtor. As mentioned earlier, the trustee was in fact afforded advance notification of Davis' subsequent auction sale.

■ Third, this Court agrees with the conclusion by the Pennsylvania Court of Common Pleas in *Turner v. National Bank of Olyphant*, 1991 WL 319160 (Pa.Com.Pl. 1991), that a failure to properly effect notice under § 9504(c) does not, by itself, extinguish any deficiency claim that may be asserted by a foreclosing creditor under the law as it exists in Pennsylvania. *Olyphant*, 1991 WL 319160 at 2–5. The *Olyphant* court, in deciding as it did, expressly disagreed with substantially older decisions to the contrary by other courts interpreting Pennsylvania law. *Id.* at 2 (disagreeing with *Skeels v. Universal C.I.T. Credit Corp.*, 222 F.Supp. 696 (W.D.Pa.1963), and *Alliance Discount Corp. v. Shaw*, 195 Pa.Super. 601, 171 A.2d 548 (1961)). This Court may also hold in a fashion contrary to these older decisions since none of them (a) emanated from the Supreme Court of Pennsylvania, and (b) are particularly persuasive to this Court.[5] The *Olyphant* court determined in-

the instant case." Upon reflection the Court concludes, without any difficulty, that any factual differences between *Reuter* and the instant case are insignificant with respect to this particular issue concerning notice. Furthermore, the persuasiveness of the decision by the *Reuter* court is not diminished merely because that court's decision appears to be at odds with those of several other lower courts in Pennsylvania and bankruptcy courts in the Eastern District of Pennsylvania that have construed § 9504(c); instead, the decision in *Reuter* only signals to this Court that perhaps there may be a split among courts on this particular issue, which split has not yet apparently been resolved by either the Supreme Court of Pennsylvania or the Third Circuit. If *Reuter* indeed signals a split, and until said split is resolved by one of the latter two courts just mentioned, this Court shall follow *Reuter* when faced with a factual situation, such as the one herein, which is similar to the one encountered by the court in *Reuter*.

4. Counsel for the debtor asserted at the hearing on August 14, 1997, that principals for the debtor might be subject to further liability vis-a-vis Fremont pursuant to personal guaranties, thereby entitling the debtor to notification. The Court

cannot accept this argument now, however, since the debtor neither pleaded, nor submitted evidence substantiating, the existence of said guaranties. Moreover, even if such guaranties were to exist, accompanied with a failure by Fremont to notify those liable thereon (which failure this Court does not believe occurred since the primary principal for the debtor was also present at the court hearing on February 11, 1997, when notice was given in accordance with § 9504(c) and *Reuter*), such circumstances would not, in any event, disturb Fremont's deficiency claim against either the bankruptcy estate or the debtor; rather, such circumstances would only impact Fremont's remaining deficiency claim against said guarantors.

5. The debtor also cites in its brief many cases from courts in other states that apparently support extinguishment of a creditor's deficiency claim if notice is not given. However, the *Olyphant* court cited a substantial number of cases from other state courts supporting its contrary position. *Olyphant*, 1991 WL 319160 at 3–4. It suffices to say that there is a genuine split among state courts as to this particular issue, and that this Court sides with those that do not favor *per*

stead that, rather than effecting a *per se* extinguishment of a creditor's deficiency claim, a failure to properly notify a debtor "create[s] a rebuttable presumption that the collateral disposed of without notice ha[s] a value equal to the debt." *Id.* at 5. Without question, however, Fremont has rebutted any such presumption that would have attached had it failed to effect notice given that (a) Davis only received net proceeds of $265,889.01 from its auction sale, which figure does not account for, *inter alia*, a ten percent broker commission that Fremont would have incurred had it conducted an auction sale itself, and (b) said net proceeds, even if not adjusted for costs saved by Fremont, are woefully short of Fremont's pre-petition claim of $441,689.62, which figure has risen substantially due to post-petition interest and costs. Therefore, Fremont's deficiency claim against the bankruptcy estate would not have been extinguished even had Fremont failed to properly effect notice as required under § 9504(c). Instead, such a failure would only have entitled the bankruptcy estate to a claim against Fremont for any loss pursuant to 13 Pa.C.S.A. § 9507(a). *Id.* at 3–5. Such a loss, however, was not, nor could it likely have been, established by the debtor given that the direct sale of the property to Davis appears to have been commercially reasonable (a) when viewed strictly as a business decision,[6] and (b) by virtue of this Court's February 11, 1997 order which approved said disposition, since a disposition in accordance with court approval "shall conclusively be deemed to be commercially reasonable." 13 Pa.C.S.A. § 9507(b) (Purdon's 1984).

*se* extinguishment of a deficiency claim if a fore-closing creditor fails to effect detailed written notice upon a debtor prior to disposition of its collateral.

6. Fremont received $198,000.00 from Davis for the direct sale of the collateral. Davis received from its subsequent auction sale gross proceeds of $319,239.25 against costs of $53,350.24, or net proceeds of $265,889.01. However, as noted above, Fremont would have incurred a ten percent broker commission expense had it conducted the auction sale itself, which, when calculated upon $319,239.25 in proceeds, would have amounted to $31,924.00. Deducting this cost from $265,889.01 results in net proceeds of $233,965.01. Therefore, Fremont received only

Therefore, Fremont's deficiency claim against the bankruptcy estate was neither extinguished nor reduced in amount by Fremont's failure to notify the debtor in advance of Davis' auction sale.

**II.** ***Whether Fremont failed to properly reduce the principal portion of its claim for approximately $150,000.00 in post-petition adequate protection payments that were made by the debtor, and whether said alleged failure should have prevented Fremont from receiving turnover of the $45,887.17 in proceeds held by the trustee?***

The debtor is also mistaken in having concluded that (a) Fremont acted improperly by applying the debtor's post-petition adequate protection payments to Fremont's post-petition interest and costs, and (b) Fremont's application of said payments, if improper, would have impacted Fremont's request for turnover of the $45,887.17.

 Adequate protection payments may be allocated by a creditor to post-petition interest and costs provided that there exists, and then only to the extent of, excess collateral (ie., oversecurity); thereafter, a creditor must allocate said payments to the reduction of the principal portion of its claim. *In re Indian Palms Associates, Ltd.,* 61 F.3d 197, 201 (3rd Cir.1995); *see also* 3 *Collier on Bankruptcy,* ¶ 361.03[2][a][ii] at 361–11 (Bender 1997). When adequate protection payments are made post-petition, the existence, as well as the amount, of a creditor's oversecurity is determined as of the time that the bankruptcy petition is filed. *Indian Palms,* 61 F.3d at 201–02, 210–12.[7] Using

$35,965.01 less than it might have received had it conducted the auction sale itself, which amount appears to the Court to have been a reasonable discount for Fremont to pay so as to avoid the risk of receiving less than $198,000.00. Such risk might have materialized in numerous ways, such as higher sales expenses incurred by a non-sale professional or lower gross proceeds.

7. The Court believes that, consistent with *Indian Palms,* the existence and amount of a creditor's oversecurity should technically be calculated as of the time when adequate protection is first sought, *see also* 4 *Collier on Bankruptcy,* ¶ 506.02[6][j] at 506–32 (Bender 1997), which time will not necessarily coincide with the petition filing date. However, since Fremont initial-

either the debtor's own valuation of its machinery, equipment, and inventory, or the lower valuation ascribed to said items by Fremont, Fremont's collateral was worth at least $642,339.00 [8] as of the commencement date of this case. Said value exceeds Fremont's pre-petition claim of $441,690.00 by $200,649.00, thereby establishing the existence as well as the amount of Fremont's oversecurity as of the date of the petition filing.[9] Because the amount of Fremont's oversecurity exceeds the $150,000.00 in post-petition adequate protection payments that were made by the debtor, Fremont thus acted properly in applying the entire amount of said payments to its post-petition interest and costs.

The Court also notes that Fremont would have been entitled to a turnover of the $45,887.17 even if the Court had determined that Fremont should have applied the debtor's post-petition adequate protection payments to the principal portion of Fremont's claim. This is because, after reducing Fremont's pre-petition claim of $441,690.00 [10] by

---

ly sought adequate protection early on in this case, the value of Fremont's collateral, as well as the existence and amount of its oversecurity, should appropriately be established as of the debtor's petition filing date. The Court also notes that it need not concern itself with the issue of valuation timing when adequate protection payments are not made periodically during the post-petition period since that fact pattern did not arise in this particular case.

8. The debtor valued Fremont's collateral at $1,383,339.00 in its bankruptcy schedules. Included in that figure are amounts for its equipment, machinery, and inventory of $168,000.00, $593,000.00, and $350,000.00, respectively. Fremont valued those particular items at a substantially smaller figure of approximately $370,-000.00, which, if substituted for the debtor's figures, results in a valuation of total collateral equal to $642,339.00.

9. Although the debtor's counsel asserted at the hearing on February 11, 1997, that Fremont must have been *undersecured* on August 2, 1994, since the debtor agreed to provide Fremont with additional adequate protection at that time, this Court cannot conclude similarly based merely upon the fact that the parties entered into said agreement. First, the Court notes that Fremont had continuously sought, in the year prior to said agreement, (a) additional adequate protection from the debtor, (b) a denial of the debtor's use of Fremont's cash collateral, and (c) relief from the automatic stay so that it could foreclose on its collateral, alleging that the debtor lacked equity in said collateral and that it could not effectively reorganize. The Court also notes that both parties recognized, in the stipulation regarding said agreement, .that the debtor had failed to make any post-petition payments to Fremont for the entire year prior to the consummation of said agreement. Second, the Court cannot believe that the debtor would have wished to concede, even implicitly by said agreement, that its property was worth substantially less than it had asserted in its bankruptcy schedules given that (a) it had not yet proposed a plan worthy of confirmation, let alone attained confirmation of a plan, and (b) such a concession with respect to valuation of its property at this time might have,

*inter alia*, (i) endangered its prospects for confirmation of a plan, or (ii) fueled future attempts by Fremont to obtain further adequate protection or relief from the automatic stay. Against this background, the Court concludes that the debtor entered into the agreement on August 2, 1994, merely to avoid further litigation regarding the adequate protection issue, as well as to stem further attempts by Fremont to obtain relief from the automatic stay or to prevent the debtor's usage of the cash collateral. The Court most certainly cannot conclude that, because the debtor entered into said agreement, (a) the debtor, therefore, wished to retreat from the position, which it had continuously maintained prior to August 2, 1994, that Fremont was *oversecured*, which position had also been both maintained by the unsecured creditor's committee and accepted by Judge Bentz in 1993, or (b) Fremont was, in fact, undersecured as of either the petition filing date or August 2, 1994. Therefore, the Court must utilize the valuations available to it as of the petition filing date, as well as subsequent thereto, none of which establish that Fremont was undersecured as of the petition filing date or on August 2, 1994.

10. The Court notes that a split exists among courts as to whether post-petition adequate protection payments, when applied to the principal portion of a creditor's pre-petition claim, should be applied first to the secured portion or the unsecured portion of said claim. 3 *Collier on Bankruptcy*, ¶ 361.03[2][a][i] at 361–9 note 13 (Bender 1997). However, the Court need not concern itself with this issue since (a) Fremont's claim was oversecured as of the petition filing date, which is when Fremont initially sought adequate protection (although Fremont was also oversecured as of the date that adequate protection payments commenced), and (b) valuation for the purpose of establishing a creditor's secured position is done, when adequate protection is sought by a creditor, when said protection is first sought. 4 *Collier on Bankruptcy*, ¶ 506.02[6][j] at 506–32 (Bender 1997). Therefore, if Fremont had applied the post-petition adequate protection payments to the principal portion of its pre-petition claim, said payments would have been

**106**

(a) the $150,000.00 in post-petition adequate protection payments, and (b) the $198,000.00 in proceeds from Fremont's sale of collateral to Davis, Fremont still would have had a deficiency claim of $93,690.00, which obviously exceeds $45,887.17. Thus, the debtor's dispute regarding proper application of its post-petition adequate protection payments is essentially academic, if not moot, at this time.

Therefore, (a) Fremont appropriately applied the debtor's post-petition adequate protection payments to Fremont's post-petition interest, (b) even if said application of payments was improper *arguendo*, it would not have had any impact upon Fremont's request herein for turnover of the $45,887.17 in proceeds held by the trustee, and (c) Fremont's application of the post-petition payments should not have prevented it from receiving a turnover of the $45,887.17 in proceeds held by the trustee.

### CONCLUSION

Fremont's deficiency claim against the bankruptcy estate was neither extinguished nor reduced in amount by Fremont's failure to notify the debtor in advance of Davis' auction sale. Fremont's deficiency claim was also not negatively impacted by its crediting of the debtor's post-petition adequate protection payments to its post-petition interest. Therefore, Fremont was entitled to a turnover of the $45,887.17 in proceeds held by the trustee pursuant to 11 U.S.C. § 725. Orders were entered on August 14, 1997, and August 15, 1997, that are in substantial accord with this memorandum opinion.

applied to the total balance of said claim, or $441,690.00.