In re VEST ASSOCIATES, Debtor.

Bankruptcy No. 96 B 43617(TLB).

United States Bankruptcy Court,
S.D. New York.

March 18, 1998.

Wachtel & Masyr, L.L.P. by Michael S. Etkin, New York City, for Debtor.

Golden, Wexler & Sarnese, P.C. by George Paidoussis, Garden City, NY, for Alanises.

Smith, Campbell & Paduano by Jordan D. Becker, New York City, for Committee of Unsecured Creditors.

**OPINION DENYING IN PART AND GRANTING IN PART THE DEBTOR'S OBJECTION TO AMENDED CLAIM # 18 OF ARTHUR AND VIRGINIA ALANIS**

TINA L. BROZMAN, Chief Judge.

Vest Associates, Inc., the chapter 11 debtor ("Debtor"), objects to claim number 18 of

Arthur and Virginia Alanis, the joint first mortgage holders on the real property that the Debtor sold during its chapter 11 case. When that sale closed, the Debtor paid the Alanises the outstanding principal and the contract rate of interest; at issue, however, are certain additional charges sought by the Alanises.

### I.

The facts are undisputed. Prior to its bankruptcy, the Debtor, a limited partnership, held the fee simple interest in certain land and buildings in Los Angeles, California, on which was constructed a shopping center. The land consisted of three separate parcels, one of which the Debtor had purchased from the Alanises in 1989 and as to which the Debtor had executed a deed of trust (the "Deed") and a thirty year installment note in the amount of $300,000, bearing an annual interest rate of 10%. The note obligated the Debtor to make monthly payments by the 3rd of every month with a ten-day window before a late charge of 10% of the payment would be incurred. The installments were originally in the amount of $2,660.48, later amended to $2,632.32. If the Debtor defaulted under the note, the interest rate would increase to 15% until the default were cured. Although the note provided that it could not be prepaid without the prior written consent of the Alanises, it was silent as to any remedy the Alanises would have in the event that this provision were breached. The Deed provided that the Debtor would pay the Alanises attorneys' fees in the event that the Alanises had to commence an action on the note or had to appear in or defend any action that might affect their security interest or their rights and powers under the Deed.

The Alanises entered into this transaction to provide a retirement vehicle for themselves and a potential inheritance for their daughter, goals they communicated to the Debtor in September 1994, when they advised the Debtor by letter that they were not interested in accepting prepayment of the note or selling the property prior to the note's expiration if either goal would be thereby threatened.

In 1993, the Debtor encumbered the property with two other mortgages, one granted to Sherman Hayvenshurst Partners and the other, to the predecessor of Glendale Federal Bank, which now holds that mortgage. Eventually, the Debtor found servicing the loans too cumbersome. In 1996, the two institutional mortgagees commenced foreclosure actions. Despite its efforts to locate refinancing and faced with the imminent appointment of receivers in both actions, the Debtor filed its chapter 11 petition on July 8, 1996.

During the early stages of this case, the Debtor continued looking for ways to refinance the mortgages in the hope of reorganizing but learned that without significant cash infusions from the limited partners, which were not forthcoming, a successful rehabilitation was unlikely. The alternative, which the Debtor seized, was to sell the property to fund a liquidating plan of reorganization.

When the sale closed on March 28, 1997, the Debtor paid the principal balances of the three outstanding mortgages together with uncontested interest in full. The Alanises received payment of $283,143.98 for principal and $4,411.73 for the contract rate of interest at 10%, amounts to which the Alanises agreed.

Prior to this sale, I had approved a stipulation authorizing the Debtor's use of cash collateral which provided, so far as pertinent, that the Debtor was to pay, if available, the sum of $2,357.70 to the Alanises on the 15th day of each month, an amount roughly equivalent to the mortgage payments that the Debtor was making pursuant to the note. December 7, 1997 hearing, Tr. at 10 ("Tr. at ___"). In approving the parties' stipulation, I inserted the proviso, with their consent, that "nothing contained in this order shall be deemed to be an adjudication of whether the adequate protection payments to be made should be applied to principal or interest and the rights of all parties in interest to obtain an adjudication of this issue are hereby preserved." *Stipulation and Order Authorizing the Debtor's Use of Cash Collateral and Granting Related Relief,* October 9, 1996,

Doc. # 24. The Debtor concedes that the Alanises were oversecured. Tr. at 4.

The Alanises filed a timely proof of claim in the secured amount of $328,000, representing what they believed to be the unpaid balance of the mortgage, plus $8,066.81 for prepetition arrears. Three months after the last date to file claims, they filed an amended proof of claim reducing the outstanding principal balance to $283,143.98, an amount coinciding with the principal that the Debtor paid at closing. The amended claim added postpetition interest on the mortgage, late charges, prepetition and postpetition attorneys' fees, and significantly, sought for the first time over $200,000 for losses resulting from the Debtor's prepayment of the mortgage and the amount of some $92,000 representing the income tax liability that the Alanises claim they would face as a result of the prepayment.

## II.

Besides objecting to various components of the Alanises' amended claim, the Debtor had originally sought that claim's expungement as untimely and unrelated to the original claim. Prior to the return date for the objection, counsel for the Debtors and the Alanises reached a partial resolution, leaving for my consideration only four issues which I will address *seriatim*.

A. *The Alanises' Claim for Reimbursement of Income Tax Liability*

Bankruptcy Code § 506(b) provides that to the extent that an allowed claim is oversecured, "there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."

In financing the mortgage for the Debtor, the Alanises had hoped to generate investment income over 30 years, the life of the loan. To that end, the note provides that it "cannot be prepaid without the prior written consent of the holder." Nevertheless, the note and the Deed are silent as to any penalties or damages that would arise from the breach of this provision.

The Alanises have conceded that because the note does not include a damage or penalty provision in the event of the Debtor's prepayment, they cannot recover damages for any lost interest opportunity or other damages resulting from the prepayment. Tr. at 18–19. *See, e.g. Continental Securities v. Shenandoah Nursing Home*, 188 B.R. 205, 214 (W.D.Va.1995), *aff'd*, 193 B.R. 769 (W.D.Va.), *aff'd*, 104 F.3d 359 (4th Cir.1996). Nonetheless, they argue, they are entitled to be compensated for the adverse tax consequences which they assert will be caused by the prepayment. As inspiration for an appropriate remedy, they point to § 105 of the Bankruptcy Code, the fountain of equitable relief.

When asked about the apparent conflict between his clients' arguments for equity and section 506(b) of the Bankruptcy Code, which permits oversecured creditors to receive reasonable fees, costs or charges so long as they are provided for under the loan documents, the Alanises' counsel acknowledged the friction. Tr. at 20. Other than an appeal to my equitable powers, the Alanises do not supply any legal authority for the proposition that a bankruptcy court may read into a contract damage provisions which the parties themselves have failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan or note. Unremarkably, there is no supportive decisional law. On the other hand, as one bankruptcy judge recently noted, there is no reported decision which allows a prepayment premium in the absence of a formula for the calculation of that premium being set forth in the instrument. *Continental Securities Corp. v. Shenandoah*, 188 B.R. at 215–16.

 The appeal to equity is doomed to fail, for the Supreme Court has instructed that whereas a bankruptcy court is a court of equity, *Pepper v. Litton*, 308 U.S. 295, 303–304, 60 S.Ct. 238, 243–244, 84 L.Ed. 281 (1939); *Katchen v. Landy*, 382 U.S. 323, 327, 86 S.Ct. 467, 471, 15 L.Ed.2d 391 (1966), its equitable powers are circumscribed by limitations contained in the Bankruptcy Code and other applicable federal law. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169

(1988); *see e.g., United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986) (section 105 does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity"). Recovery of fees, costs, and charges pursuant to section 506(b) is allowed only if they are reasonable and provided for in the agreement under which the claim arose. Therefore, in the absence of such an agreement, postpetition interest is the only added recovery available. *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

### B. *Claim for Prepetition Attorneys' Fees and Expenses*

The Alanises seek reimbursement of prepetition attorneys' fees and costs of approximately $6,000 dating back to January 1993 on the grounds that the Deed provides for those fees. The Alanises claim to have conducted extensive "litigation" and negotiations with the Debtor throughout this entire prepetition period with respect to the note. Their interpretation of paragraphs 3 and 4 of the Deed leads them to conclude that the Debtor is obligated to reimburse their attorneys' fees, even though they never commenced foreclosure proceedings.

Paragraphs 3 and 4 of the Deed provide in relevant part:

[Vest] agrees:

(3) To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of the [Alanises]; ... to pay all costs and expenses, including ... attorneys' fees in a reasonable sum, in any such action or proceeding in which [the Alanises] may appear, and in any suit brought by [the Alanises] to foreclose this Deed.

(4) Should [Vest] fail to make any payment or to do any act as herein provided, [the Alanises] ... may: make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of [the Alanises]; pay, purchase, contest or compromise any incumbrance, charge or lien which in [their] judgment appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

The Debtor contends that the Alanises are not entitled to attorneys' fees because the note states: "If action be instituted on this note the [Debtor] promises to pay such sum as the court may fix as attorney's fees." However, the Debtor ignores the terms of the Deed just quoted.

While it is true that section 506(b) authorizes oversecured creditors to recover prepetition attorneys' fees incurred in connection with protecting their collateral, that right is limited to those creditors who have bargained and provided for the recovery of such fees in the underlying agreement. *See, e.g., In re Charter Co.,* 63 B.R. 568, 571 (Bankr.M.D.Fla.1986). Sections 3 and 4 of the Deed provide that the Alanises may recover attorneys' fees for appearing in or defending "any action" that might affect their security interest or their rights and powers under the Deed. Courts have held that a security agreement need not authorize the recovery of attorneys' fees specifically in bankruptcy proceedings; reference to "proceedings" or "actions" brought to collect the debt or to protect the security interest have been held to be sufficient for the purposes of § 506(b). *First Brandon Nat'l Bank v. Kerwin–White,* 109 B.R. 626, 632 (D.Vt.1990) (*citing In re Mills,* 77 B.R. 413, 417 (Bankr. S.D.N.Y.1987)).

In most instances, such language will be sufficient to bring a secured party's prepetition fees into the ambit of section 506(b) where the secured party instituted an action such as a foreclosure proceeding which in turn leads to the bankruptcy filing. The rub here is that the Alanises, unlike the other mortgagees, did not institute foreclosure proceedings. In fact, as the Alanises admit, at most, the Debtor was in default for one month prior to its chapter 11 filing. The lack of either any "action or proceeding in which [the Alanises] may appear, [or] any suit brought by [the Alanises] to foreclose this

Deed," as set forth in section 3 of the Deed, is fatal to the Alanises' claim for prepetition attorneys' fees.

Section 4 of the Deed accomplishes no different result for the Alanises. Their counsel's invoices show that the prepetition legal services, taken in their best light, were not necessary to the protection of the Alanises' security interest. For example, the Alanises seek reimbursement of attorneys' fees for their denial of the Debtor's request to amend the loan documents to permit prepayment of the note. Negotiations regarding the terms of a possible amendment to a loan document do not relate to the enforcement of the Deed or the note. The Alanises have not shown that they had to step in to perform any obligations as set forth in section 4 of the Deed that the Debtor failed to perform. Accordingly, the charges for prepetition attorneys' fees are denied.

## C. *Default Interest and Late Charges*

The Debtor's final two objections encompass the Alanises' inclusion of default interest in the amount of $10,386.61 and late fees in the amount of $1,886.16, both of which the Debtor feels are unreasonable and should be reduced.

■ The decisional law is uniform that oversecured creditors may receive payment of either default interest or late charges, but not both. *In re Kalian*, 178 B.R. 308, 312 n. 9 and 316 n. 18 (Bankr.D.R.I.1995); *In re 1095 Commonwealth Ave. Corp.*, 204 B.R. 284, 305 (Bankr.D.Mass.1997). While the general rule in bankruptcy is that "interest on debtors' obligations ceases to accrue at the beginning of the proceedings." *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946), postpetition interest continues to accrue on oversecured claims until payment of the claims or until the effective date of a confirmed plan. *Rake v. Wade*, 508 U.S. 464, 466, 113 S.Ct. 2187, 2190, 124 L.Ed.2d 424 (1993). Section 506(b) is silent, however, as to what rate of interest is to be applied.

Neither *Ron Pair* nor *Rake v. Wade* fills the hole.

■ Parties use default interest rates as a means to compensate a lender for the administrative expenses and inconvenience in monitoring untimely payments. Because the costs incurred in performing this task will vary from case to case, the increased interest rate is a compromise by the lender and the borrower in recognition of the fact that attempting to quantify the exact dollar amount of the lender's injury would be impractical.[1] *In re Terry, L.P.*, 27 F.3d at 244 (*citing In re Consolidated Properties, L.P.*, 152 B.R. 452, 457 (Bankr.D.Md.1993)), *cert. denied*, 513 U.S. 948, 115 S.Ct. 360, 130 L.Ed.2d 313 (1994). The inclusion of a default rate actually may benefit a debtor because it has the benefit of a lower rate until an event triggering default occurs. *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir.1959), *cert. denied*, 361 U.S. 947, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960) (anticipating a possible loss in the loan due to bankruptcy would require lender to impose a higher uniform interest rate for the entire life of the loan).

The Debtor and the Alanises agree that the amount sought within the amended claim, $10,386.61, represents the 5% difference between the contract rate of the note, 10%, and the default rate, 15%. They also agree that the Debtor had defaulted on the note in the month prior to the filing of its bankruptcy petition. But the parties disagree over the propriety of a default rate, the Debtor arguing that its payments under the cash collateral stipulation cured its default. They also disagree over the length of time that the default interest should accrue. The Debtor argues that its adequate protection payments ought be deemed a resumption of payments to the Alanises under the note sufficient to cure the prepetition default to no more than a 2–3 month period, thereby limiting any default rate interest to that period of time. The Alanises believe that they are entitled to the default rate for the period commencing with the prepetition default through the date

---

**1.** I draw no distinction between an institutional lender and an individual lender in this regard, although arguably where an individual is reliant upon the stream of mortgage payments as income, even one late payment may be deleterious.

the note was paid at closing, a period of approximately 10 months.

I find unavailing the Debtor's argument that its adequate protection payments cured its prepetition default. As the Debtor conceded, it did not make any payments on the note in the month that it filed for chapter 11 relief and for at least two months thereafter, thereby creating an arrearage of approximately $7,900.00. The stipulation provided that the Debtor pay the Alanises the monthly amount of $2,357.70, an amount nearly $275 less than the $2,632.32 payment due under the note. Because the stipulation did not obligate the Debtor to cure any arrearages to its mortgagees, the arrearages owed by the Debtor to the Alanises continued to grow by $275 per month until the closing on the sale of the shopping center. In light of the increasing arrearages, I reject the Debtor's contention that payments in amounts which were less than the amounts called for by the note could be construed to cure the Debtor's default. But this does not end the inquiry, for as shall be seen, I must examine equitable considerations to determine whether the Alanises are entitled to default interest.

■ Although it is unquestioned that a secured creditor is entitled to postpetition interest, it is equally clear that there is an absence of uniformity in the treatment of default interest provisions. *In re White*, 88 B.R. 498, 510 (Bankr.D.Mass.1988). Courts differ over the characterizations of such charges and the legal consequences attending to their imposition. *Id.* The developing consensus is a presumption in favor of the contract default rate subject to equitable considerations.[2] *In re Terry, L.P.*, 27 F.3d at 243. This equitable approach permits a court to examine the specific facts of each case to determine whether the circumstances warrant application of the higher default rate. These considerations generally hinge upon the question of whether the default rate compensates the creditor for any loss resulting

from nonpayment or is in fact a disguised penalty. *In re Johnson*, 184 B.R. 570, 573 (Bankr.D.Minn.1995) (citing cases). The presumption may be rebutted if the rate is significantly higher without any justification offered for the spread or where the default rate appears inordinately high in relation to the non-default rate. *See In re Hollstrom*, 133 B.R. 535, 539–40 (Bankr.D.Colo.1991) (nondefault rate of 12% vs. default rate of 36%); *In re DWS Investments*, 121 B.R. 845, 849 (Bankr.C.D.Cal.1990) (14% and 15% vs. 25%); *In re White*, 88 B.R. 498, 511 (Bankr. D.Mass.1988) (16.5% vs. 48%) ("White I"). A court will refuse to enforce such rates if they are deemed to be penalties or forms of coercion instead of compensation for injuries that the lender incurred. In contrast, default rates with a much lower differential have been found reasonable subject to other equitable concerns. *See In re Terry, L.P.*, 27 F.3d at 244 (17.25% default rate versus 14.25% nondefault rate); *In re White*, 88 B.R. 494 (Bankr.D.Mass.1988) (default rate of 19.25% versus 14.25% nondefault) ("White II"); *In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D.Cal.1987) (default rate of 14.75% versus 10.75% nondefault).

■ To support their claim to a 15% default rate, the Alanises cite to *White II* in which the court found a 5% differential between the predefault and nondefault rates reasonable. *In re White*, 88 B.R. at 498. There, because the debtor was solvent and had failed to introduce evidence to support its assertion that the rate was unconscionably high or inconsistent with market rates, the court was disinclined to "cavalierly" ignore the rate that the debtor and the banks had agreed upon in favor of permitting the debtor to gain a windfall by being relieved of its obligation under the note. *Id.* The fact that the debtor was solvent, while not dispositive, was a consideration that bolstered the court's ruling that the contract rate should remain undisturbed. *Id.*[3]

---

2. Nearly all courts agree that the basis for an equitable analysis of postpetition interest is rooted in the proposition that the Supreme Court set out long ago: "It is manifest that the touchstone of each ... decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and

creditor or between creditor and debtor." *Vanston Bondholders*, 329 U.S. at 167, 67 S.Ct. at 241.

3. However, in a companion motion, the same court struck down the default interest of a secured creditor, the debtor's solvency notwith-

If a debtor is solvent, there is much more leeway to grant the default rate because other creditors will not be injured. *See Ruskin v. Griffiths,* 269 F.2d at 832 (where debtor is solvent and unsecured creditors will not be harmed by imposition of higher interest rate, payment of default rate may be proper), *cert. denied,* 361 U.S. 947, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960); *In re Hollstrom,* 133 B.R. at 539 (because benefit from reduction in the default rate would inure to the debtor, not to the creditors, higher rate was proper) (*citing In re Consolidated Operating Partners, L.P.,* 91 B.R. 113, 117 (Bankr.D.Colo. 1988)).

A debtor's solvency is thus an important factor in determining whether default interest should be allowed. *In re Kalian,* 178 B.R. 308, 314 & n. 16 (court should take a "hard look" at postpetition interest entitlements particularly where estate is insolvent because prebankruptcy bargain can be enforced only at the expense of junior, usually unsecured, creditors) (citing cases); *In re W.S. Sheppley & Co.,* 62 B.R. 271, 278–79 (Bankr.N.D.Iowa 1986). In *Kalian,* the secured creditor argued for payment of the contractual default rate of 36%. Before finding the rate to be excessively high, the court found that the bankruptcy process had protected the creditor from all the risks and costs that might support enforcement of an increased interest rate. 178 B.R. at 316. There was no cognizable risk that the creditor would go unpaid or even underpaid because of the equity cushion that existed in the case. *Id.* Even if the collateral had been threatened, the court noted, the creditor could have sought adequate protection or stay relief pursuant to 11 U.S.C. § 362(d). *Id.* Finally, the court noted that the creditor received all of the charges to which it was entitled. *Id.*

In *Hollstrom,* the court found that the default rate of 36% was inappropriate because the debtor was insolvent, a fact that

standing. *In re White,* 88 B.R. 498, 511 (Bankr. D.Mass.1988). The court held that the default rate, equivalent to 48% per annum, was unconscionable because it was grossly disproportionate to the damages caused by the debtor's breach. *Id.* The lesson from these two cases is that a debtor's insolvency and the contract rate of default interest are but two of the equitable consid-

distinguished the case from *Ruskin.* 133 B.R. at 539 n. 7. Allowance of such a rate would not advance the reorganization process because it would sweep up virtually all the available assets of the debtor, leaving nothing for other creditors. *Id.* at 541; *In re Boardwalk Partners,* 171 B.R. 87, 91 (Bankr. D.Ariz.1994) (agreeing with *Hollstrom* that default rate is a penalty against junior creditors).

■ Here, like the debtor in *White II,* the Debtor failed to provide legal or factual support in its objection or reply papers that would indicate that the default rate of 15% is unreasonable or unconscionable. As the above cases suggest, a differential of 5% certainly falls within the range of reasonableness. *See, Terry, L.P.,* 27 F.3d at 244 (testimony demonstrated that default rates customarily range between 2.5% and 4.5% over the predefault rate).

However, neither party introduced any evidence on the issue of the Debtor's solvency. Only the Debtor's first amended plan contains financial information. This is of little assistance because the Debtor is equivocal as to whether unsecured creditors will be paid in full under a plan. *See Debtor's First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code,* April 30, 1997, doc. # 86; Ex. A at p. 26 ("Allowed [general unsecured creditors] may be impaired under the Plan") (*quoting from* Debtor's First Amended Chapter 11 Plan of Liquidation); *Kalian,* 178 B.R. at 315 n. 15 (citing cases).

Were I to deem the Debtor solvent based on this incomplete record, the Alanises stand to recover an additional $10,000 in enhanced interest to the potential detriment of junior creditors if the Debtor turns out to be insolvent. This potential harm to general unsecured creditors weighs in favor of denial of default interest at present.[4] In addition, remember that one of the purposes for default

erations in a fact-intensive analysis for determining whether default interest should be permitted.

4. Recent case law from the Ninth Circuit describes an ongoing debate regarding the allowability of default interest in the context of section 363 asset sales. Courts are split over the question of whether a debtor's full payment of out-

interest is to address the impracticality of quantifying a secured creditor's costs in monitoring a default; the Alanises had no such expenses because the Debtor went into default just prior to filing bankruptcy. The Alanises had received all their payments on the note up until the last month prepetition and did not have to take any action to protect their collateral during the initial stages of this case thanks to their first position and equity cushion. Within three months of the filing, they began receiving adequate protection payments and seven months later received full payment of principal, interest and postpetition attorneys' fees. *Kalian*, 178 B.R. at 316–17 (reporting similar facts). In contrast, the Debtor here is in liquidation and may be insolvent. Consequently, I am denying the Alanises' request for default interest.[5,6]

The Debtor's final objection is to the late fees the Alanises seek based on the fact that the adequate protection payments, if considered to be surrogate mortgage payments, were late under the terms of the note. The note required the Debtor to make payments on the 3rd of the month and granted a ten day extension to pay an installment before a late charge was incurred. The adequate protection stipulation set the 15th of the month as the due date for payments. The cash collateral stipulation did not provide for late charges.

The Debtor does not point to any case law or language in the cash collateral stipulation to support its case for denial of these charges. Echoing the Alanises' earlier, failed resort to arguments of equity, the Debtor's only support for its objection is that the Alanises received adequate protection payments under the cash collateral stipulation in almost the same amount as they would have been entitled to if no bankruptcy had been filed.

---

standing principal and interest at closing to an oversecured creditor cures a prepetition default so that the creditor would only be entitled to interest at the nondefault rate. *Casa Blanca Project Lenders, L.P. v. City Commerce Bank (In re Casa Blanca Project Lenders, L.P.)*, 196 B.R. 140 (9th Cir. BAP 1996) (no difference between the equitable consequences for a secured creditor whose collateral is liquidated under section 363 or section 1123) (adopting the reasoning of *In re 433 South Beverly Drive*, 117 B.R. 563, 566 (Bankr.C.D.Cal.1990)). Two other courts in that circuit have expressly said no. *In re Boardwalk Partners*, 171 B.R. 87, 90 n. 1 (Bankr.D.Ariz. 1994); *In re Melbell Assocs., Inc.*, 99 B.R. 31, 34 (Bankr.E.D.Cal.1989). However, neither court there considered the issue in detail.

Courts outside the Ninth Circuit have not addressed this issue. Because the Debtor did not raise this argument, I need not join the debate.

5. My holding is to be distinguished from the Seventh Circuit's case, *In re Terry, L.P.*, 27 F.3d 241 (7th Cir.1994), *cert. denied*, 513 U.S. 948, 115 S.Ct. 360, 130 L.Ed.2d 313 (1994). In that case, after failing to propose a viable plan the debtor consented to the sale at public auction of its only asset, an office building encumbered by three mortgages. The sale generated only enough proceeds to pay the first and second mortgage holders. The third mortgagee, Invex Holdings, objected to the application by Equitable Life Insurance, the second mortgage holder, for default interest. The bankruptcy court awarded Equitable postdefault interest at the higher rate; the district court affirmed. In affirming the lower courts, the circuit court found that it was important to enforce as closely as possible the parties' bargained-for contract rights. *Id.* at 243. The court found that Invex was fully aware of the two superior interests in the property and the extent of those interests, and that armed with that knowledge, it had placed itself in a position subordinate to those mortgagees and knowingly took the risk that it would receive nothing in the event of a default. *Id.* at 245. Employing an equity analysis, the circuit court found that the default rate was reasonable and that denying Equitable its contractual default interest would be "tantamount to transferring [Invex's] risk to Equitable after the fact. There is nothing equitable about such a redistribution." *Id.*

Here there are general creditors whose distribution may be impacted negatively by the allowance of default interest to the Alanises, a fact that together with the minimal damage to the Alanises caused by the Debtor's default tips the scale in favor of disallowance of this interest unless the Debtor proves to be solvent.

6. At least one court has held that if a request for payment of default interest is disallowed preconfirmation, the request may be renewed at confirmation if it should appear that a surplus were to exist. *In re W.S. Sheppley & Co.*, 62 B.R. 271, 278–79 (Bankr.N.D.Iowa 1986). My ruling here is not intended to foreclose that possibility especially in light of the Second Circuit's longstanding position as articulated in *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir.1959) (where debtor is solvent, unsecured creditors will not be harmed by imposition of higher interest rate, payment of default rate may be proper), *cert. denied*, 361 U.S. 947, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960).

However, the Debtor ignores the impact of the bankruptcy filing. A cash collateral stipulation has been likened to a consent decree. *In re Hughes–Bechtol, Inc.,* 117 B.R. 890, 899–900 (Bankr.S.D.Ohio 1990). The stipulation was entered into by the parties after careful negotiation and embodies a compromise. In exchange for the saving of cost and elimination of risk of litigation, the parties each gave up something they might have won had they proceeded with the litigation.

 An oversecured creditor may allocate adequate protection payments to postpetition interest to the extent of its oversecurity; thereafter, a creditor must allocate the payments to reduce the principal portion of its claim. *Fremont Financial Corp. v. Izzo (Rack Engineering Co.),* 212 B.R. 98, 104–05 (Bankr.W.D.Pa.1997) (*citing In re Indian Palms Assocs., Ltd.,* 61 F.3d 197, 201 (3d Cir.1995)); *see, also* 3 L. King *et al. Collier on Bankruptcy,* ¶ 361.03[2][a][ii] at 361–11 (15th ed.rev.1998). Because the Alanises were oversecured, they were within their rights to apply the adequate protection payments to postpetition interest first and then to principal. The cash collateral stipulation provided for an orderly payment arrangement of the postpetition receipts collected by the Debtor. Neither the Alanises (or any other secured party) nor the Debtor waived their rights under the Deed or note or agreed to modify their terms in the cash collateral stipulation. Stipulation at ¶ 9 ("Nothing contained herein shall prejudice or may be construed as a waiver of the Secured Creditors' or the Debtors' rights under this Stipulation, the various Deeds of Trust, Notes and/or other related Agreements...."). As a result, the Debtor was delinquent in making payments under the note until the date the Debtor paid it in full. The late charge imposed by the note, 10% of the payment amount, has been found to be reasonable by other courts. *See In re Melbell Assocs., Inc.,* 99 B.R. 31, 34 (Bankr.

E.D.Cal.1989). Accordingly, I am overruling the Debtor's objection.

In summary, I am granting the Debtor's motion to expunge those portions of the amended claim that seek compensation for future tax liability, prepetition attorneys' fees and a default rate of interest.[7] The Alanises are allowed that portion of the claim seeking late charges. The Debtor is directed to **SETTLE AN ORDER** consistent with this decision.

---

7. At confirmation, the Debtor (or any other plan proponent) will be required to show whether unsecured creditors will be paid in full. This should not be a difficult task because the Debtor has been working on resolving questionable claims through negotiation or objections prior to setting a date for confirmation. In the event that a surplus exists after all payments required by a confirmed plan are made, the Alanises will be permitted to renew their request for default interest. If the Alanises were to prevail, the amount of late charges they have received would be credited against the default interest so as to avoid a double recovery.