**IN RE: Larry Ray LEMMING, Debtor.**

**CASE NUMBER 14–43080–MGD**

United States Bankruptcy Court,
N.D. Georgia, Rome Division.

Signed June 17, 2015

Filed June 18, 2015

---

**36.** Case No. 5:09–CV–00419–FL, op. at 395 (E.D.N.C. Feb. 9, 2010).

Brian R. Cahn, Brian R. Cahn and Associates, LLC, Cartersville, GA, for Debtor.

Albert Clark Guthrie, K. Edward Safir, Atlanta, GA, for Trustee.

## ORDER DENYING CONFIRMATION

Mary Grace Diehl, U.S. Bankruptcy Court Judge

A trial on confirmation of Larry Ray Lemming's ("Debtor") Fifth Amended Chapter 13 Plan (Doc. 41) was held on June 10, 2015. Creditor Dwayne L. Richardson ("Richardson") and the Chapter 13 Trustee filed objections to confirmation. (Docs. 21, 44). Brian R. Cahn appeared for the Debtor, K. Edward Safir appeared for the Chapter 13 Trustee, and Richardson appeared *pro se.* The Court heard testimony from Charles E. Griffin, Debtor, and Richardson. After the trial, the Court denied confirmation. This Order memorializes the Court's decision and constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052(a). This matter is a core proceeding under 11 U.S.C. § 157(b)(2)(L) and venue is proper.

## I. Findings of Fact

Debtor and Richardson were engaged in an oral partnership agreement. (Verdict and Judgment, *Lemming v. Richardson,* No. 2009CA35,343 (Ga. Super. Ct. Apr. 13, 2011), Claim 1–2 at 3). In litigation arising from a partnership dispute, the Superior Court of Chattooga County, Georgia awarded Richardson a judgment of $144,895.64 against Debtor on April 8, 2011. (*Id.* at 5). The judgment included a $10,000 award of attorney's fees based on Debtor's "willful" conduct. (*Id.* at 4). A Writ of Fi. Fa. was recorded against Debtor on June 10, 2011. (Claim 1–2 at 6).

Debtor filed his first Chapter 13 case on September 27, 2013. (*Voluntary Petition (Chapter 13), In re Lemming*, No. 13–42802–mgd (Bankr. N.D. Ga. Sept. 27, 2013), Doc. 1) [hereinafter *Lemming I*]. Debtor filed his Seventh Amended Chapter 13 Plan in that case on September 23, 2014, which proposed a "sale cascade" to satisfy the claim of Richardson. (Seventh Am. Chapter 13 Plan, *Lemming I*, Doc. 58). The cascade plan essentially provided for Debtor to sequentially liquidate three of the properties to which Richardson's judgment lien attached, until Richardson's claim was paid in full. The liquidation of each property was to be by private sale within a set time. If a private sale could not be accomplished within that time, the plan provided for an auction to take place. (*Id.*). The plan was confirmed on October 6, 2014. (Order Confirming Plan, *Lemming I*, Doc. 63).

The first property the cascade plan proposed to sell was located at 691 County Road 642, Cedar Bluff, AL, also known as the "Lake House."[1] The cascade plan provided that if Debtor failed to procure a purchaser, the Lake House was to be sold at auction on or before November 1, 2014. (Seventh Am. Chapter 13 Plan, *Lemming I*, Doc. 58). Debtor failed to auction the property and the first case was dismissed for failure to comply on November 17, 2014. (Order of Dismissal, *Lemming I*, Doc 70).

Debtor initiated the present case by filing his second Chapter 13 petition on December 17, 2014. (*Voluntary Petition (Chapter 13), In re Lemming*, No. 14–43080–mgd (Bankr. N.D. Ga. Dec. 17, 2014), Doc. 1) [hereinafter *Lemming II*].

On that same date, Debtor filed a Chapter 13 plan which provided for another sale cascade. (*Lemming II*, Doc. 2) The dismissal of Debtor's prior case within the preceding 1–year period subjected Debtor to the automatic stay limits of 11 U.S.C § 362(c)(3). Debtor filed a Motion to Extend Stay, and that motion was heard on January 14, 2015. (*Lemming II*, Doc. 7). The Court heard argument that the cascade plan in *Lemming II* was ostensibly filed in error, and that Debtor had intended to file a different plan. (Transcript of Jan. 14, 2015 Hrg. at 5:14–7:11, *Lemming II*, Doc. 20). However, with no new plan or evidence of changed circumstances, the Court denied Debtor's Motion to Extend Stay on the grounds that Debtor had failed to overcome the presumption that *Lemming II* was not filed in good faith by clear and convincing evidence. (*Lemming II*, Doc. 17).

Debtor persisted and filed a first Amended Chapter 13 plan, which provided for payment of Richardson's secured claim[2] as follows:

> the Debtor hereby pays creditor Dwayne Richardson by surrendering the lake house in full satisfaction of his underlying claim. Title to the lake house shall vest in Dwayne Richardson upon confirmation, and the Confirmation Order shall constitute a deed of conveyance of the lake house when recorded at on the deed books of Cherokee County, Alabama. In the alternative, upon request of Dwayne Richardson, the Debtor shall execute any deeds necessary to accomplish the conveyance.

(*Lemming II*, Doc. 15, at 8). That plan provoked an objection and a motion to

---

1. Pictures of the Lake House, marked Plaintiff's Exhibits 3 and 4, were admitted into evidence at the trial.

2. Richardson filed Proof of Claim 1–1 on December 22, 2014 in the amount of $219,017.56 as a fully seemed claim. It was amended on February 5, 2015 to provide documentation of the basis for perfection.

dismiss with prejudice from the Trustee based on, among other reasons, Debtor's lack of disclosure, incomplete schedules, and failure to fund the plan. (*Lemming II,* Doc. 21). A preliminary hearing on confirmation was held on March 11, 2015. At that time, the Court ordered briefing on whether a Chapter 13 plan may be confirmed over the objection of a secured creditor where the plan only provides that some of the collateral securing the creditor's claim be surrendered in full satisfaction of the claim and where the plan provides for a non-consensual vesting of the property.

Debtor subsequently filed his second through fourth amended Chapter 13 plans (*Lemming II,* Docs. 23, 27, 36). Richardson filed objections to the plans (*Lemming II,* Docs. 28, 40) and the Trustee filed a second Motion to Dismiss based on lack of funding and good faith. (*Lemming II,* Doc. 35). Debtor filed his opening brief on April 14, 2015 along with a Motion to Determine Value of Property. (*Lemming II,* Docs. 38, 39). Debtor filed a Fifth Amended Chapter 13 Plan along with a Supplemental Brief in Support of Confirmation on April 29, 2015, acknowledging that one of the authorities allowing nonconsensual vesting that he had relied upon in his opening brief had been reversed on appeal but asserting that his latest amended plan was confirmable notwithstanding. *Bank of New York Mellon v. Watt,* No. 3:14–CV–02051–AA, 2015 WL 1879680 (D.Or. Apr. 22, 2015); (*Lemming II,* Docs. 41, 42). The Fifth Amended Chapter 13 Plan essentially provided for the same treatment of Richardson's claim, but removed the vesting language as follows:

> Debtor owns a lake house located 691 County Road 642, Cedar Bluff, Alabama ("the lake house"), with a value of $244,000. Pursuant to 11 U.S.C. § 1322(b)(8), the Debtor hereby pays creditor Dwayne Richardson by surren-

dering the lake house to Dwayne Richardson. . . .

(*Lemming II,* Doc. 41). The plan provided that any deficiency resulting from a judicial valuation would be funded through the plan at 4.25% interest. (*Id.*) Richardson filed a further objection. (*Lemming II,* Doc. 44). Debtor brought his plan current and the Motion to Determine Value of Property came on for a preliminary hearing along with the Trustee's Second Motion to Dismiss on May 6, 2015, at which point the Court deferred the matter until after confirmation.

At trial, the Court first heard testimony from Charles E. Griffin, a Georgia real estate broker. Mr. Griffin testified about the reasons why the Lake House was not auctioned in *Lemming I.* He explained that sometime between July and August 2014, the tenants of the Lake House caused extensive damage to the property, necessitating repairs prior to sale. He also testified that there was a seasonal component to the sale, and that the property would be best positioned to sell between May and July. He further testified that no offers for the property had been received through the June 10, 2015 hearing date despite a continuous listing for sale.

The Court next heard from Debtor, who testified further about the vandalism to the Lake House. Debtor testified that his daughter had contributed money to repair the property. Debtor received an insurance check in the amount of $6,412.03 from State Farm for the damage to the Lake House but had not cashed it. (Letter dated June 9, 2015 from Russell Whittenburg to Dwayne Richardson, Creditor's Ex. 1). The day before trial, Debtor filed a Motion to Disburse Funds with respect to the check. (*Lemming II,* Doc. 52). He did not disclose the vandalism as a loss on his Amended Statement of Financial Affairs.

(*Lemming II*, Doc. 26). Debtor testified that State Farm declined to renew the insurance policy, and on June 9, 2015 at 12:01 AM, the policy was cancelled. (Letter dated April 21, 2015 to Dwayne Richardson, Creditor's Ex. 2).[3]

Debtor also testified about his other properties. He stated that he did not disclose an interest in property located at 200 Preacher Smith Road until the day before trial because he was unsure whether it was foreclosed on by Greater Rome Bank. However, on cross-examination, Debtor admitted that he had still been collecting rent payments from a tenant on the property.

Debtor also stated that there was no insurance on the property located at 4573 Ernest Drive due to title problems. He testified that he had entered into an installment sales contract three to four years ago with the tenant on that property, reduced to writing during the course of the present bankruptcy case. Debtor did not disclose the existence of this contract on his court filings.

The Court lastly heard testimony from Richardson about the Lake House. He stated he was unaware of the vandalism on the Lake House until he heard from State Farm about the $6,412.03 check. He discussed the procedures he had taken to initiate a Sherriff's sale against the Lake House and how he had received an offer from a neighbor to purchase it. Finally, he stated that disagreed with Debtor's valuation of the Lake House and estimated that it was only worth $75,000 to $100,-0000.

## II. Conclusions of Law

Section 1325 sets forth the requirements for confirmation of a Chapter 13 plan.

Two such requirements are at issue in the present case: Section 1325(a)(3), regarding good faith, and Section 1325(a)(5), regarding treatment of allowed secured claims. The Court first considers whether Debtor's Fifth Amended Chapter 13 Plan was proposed in good faith under Section 1325(a)(3), and then considers whether it properly treats Richardson's allowed secured claim under Section 1325(a)(5)(B) or (C). In both cases, the Court answers no.

### A. Debtor's plan was not proposed in good faith.

Section 1325(a)(3) requires that "the plan has been proposed in good faith and not by any means forbidden by law." The Eleventh Circuit first set forth an extensive list of non-exclusive factors for a court to consider to determine good faith in *In re Kitchens*, 702 F.2d 885, 888–89 (11th Cir.1983). In the most recent enumeration of the *Kitchens* factors, the Eleventh Circuit has listed fourteen:

(1) "the amount of the debtor's income from all sources";

(2) "the living expenses of the debtor and his dependents";

(3) "the amount of attorney's fees";

(4) "the probable or expected duration of the debtor's Chapter 13 plan";

(5) "the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13";

(6) "the debtor's degree of effort";

(7) "the debtor's ability to earn and the likelihood of fluctuation in his earnings";

(8) "special circumstances such as inordinate medical expense";

---

**3.** Debtor had been aware for at least a month that the policy was going to lapse. (Transcript of May 6, 2015 Hrg. at 8:17–18).

(9) "the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors"; (10) "the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors"; (11) "the burden which the plan's administration would place on the trustee"; (12) "the extent to which claims are modified and the extent of preferential treatment among classes of creditors"; (13) "substantiality of the repayment to the unsecured creditors"; and (14) "other factors or exceptional circumstances." *Id.*

*In re Brown,* 742 F.3d 1309, 1316–17 (11th Cir.2014). The factors are "non-exhaustive" and the Eleventh Circuit has not provided guidance as to how to weigh the respective factors, other than by emphasizing that "the facts of each bankruptcy case must be individually examined in light of [these] various criteria to determine whether the chapter 13 plan at issue was proposed in good faith." *Id.* at 1316–17 (citing *Kitchens,* 702 F.2d at 888). In *Brown,* the court noted that *Kitchens* "basically adopts a 'totality of the circumstances' approach for determining good faith or lack thereof, which is what other circuits do, too." *Id.* at 1317 (citing See *Kitchens,* 702 F.2d at 888–89, *Sikes v. Crager (In re Crager),* 691 F.3d 671, 675 (5th Cir.2012) & *Berliner v. Pappalardo (In re Puffer),* 674 F.3d 78, 83 (1st Cir. 2012)).

The Court centers its analysis on factors 5, 6, 10, and 14, which are respectively: "the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13"; "the debtor's degree of effort"; "the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors"; and "other factors or exceptional circumstances." *In re Brown,* 742 F.3d 1309, 1316–17 (11th Cir.2014). The Court concludes that Debtor has not proposed his plan in good faith for six primary reasons.

■ First, maintaining insurance on a secured creditor's collateral is a vital component of adequate protection. Here, maintenance of insurance has been a problem throughout both cases. At the hearing on Debtor's Motion to Extend, the Court remarked that Debtor's "testimony [was] less than definite as to whether there is insurance on all properties of the estate. (Transcript of Jan. 14, 2015 Hrg. at 30:18–19, *Lemming II,* Doc. 20). Now the Lake House, which Debtor describes as the "crown jewel" of ·his portfolio, is uninsured. (Letter dated April 21, 2015 to Dwayne Richardson, Creditor's Ex. 2). Debtor has been aware for at least a month that the policy was going to lapse. (Transcript of May 6, 2015 Hrg. at 8:17–18, *Lemming II,* Doc. 48). Debtor testified at the trial that Richardson is not the loss payee on his principal residence, despite having represented through counsel that all of his improved properties were insured with Richardson as the loss payee. (*Id.* at 8:13–14). Throughout the case, insurance issues were repeatedly only remedied, if at all, upon Richardson bringing the issue to the Court's attention, conduct not indicative of good faith.

Second, lack of disclosure has been a persistent issue in this case. The Court does not find credible Debtor's testimony that he collected rent payments on the Preacher Smith Road property but did not disclose it until the day before trial because he was unsure whether it was foreclosed upon. If Debtor collects rent on the property, there is no conceivable reason why he would not know he had some sort of interest in it. Debtor also testified

that he had entered into an oral install-ment sales contract for the Ernest Drive property prior to the bankruptcy, but did not disclose the existence of this contract or the nature of his interest as encum-bered. The Court lastly notes that Debtor failed to attach to his Schedule I a rental property statement showing gross re-ceipts, ordinary and necessary business ex-penses, and the total monthly net income for each of his rental properties as re-quired by Line 8a. (*Lemming II,* Doc. 24). As a result, the Court had never seen a clear picture of Debtor's income from the properties in this case.

Third, Debtor's payment history with the Trustee has demonstrated a lack of good faith. True, Debtor was current on his plan at the time of the confirmation hearing, but only after the Trustee twice moved to dismiss Debtor's case for lack of funding. (*Lemming II,* Docs. 21, 35). Debtor's payment history is part of a re-curring pattern in this case—nothing hap-pens until Debtor is presented with an imminent consequence. This sort of con-duct does not indicate good faith.

Fourth, the circumstances surrounding the dismissal of *Lemming I* and leading up to the proposal of the current Chapter 13 plan show a lack of good faith. The Court heard testimony throughout the trial that the Lake House could not be sold due to vandalism and seasonal factors. However, these proffered excuses stand in stark con-flict with the fact that Debtor himself pro-posed and sought confirmation of the cas-cade plan. The original cascade plan was confirmed on October 6, 2014, after the vandalism was caused in July or August of 2014. (Order Confirming Plan, *Lemming I,* Doc. 63). The vandalism was never disclosed in the prior case and the cascade plan was not modified to reflect that it had occurred or that a later sale date was necessary. Rather, it was the plan Debtor himself proposed that called for the prop-erty to be auctioned in its existing condi-tion and out of season. When it appeared that *Lemming I* would lead to a bad result for Debtor, he declined to comply with his own confirmed plan, permitting the case to be dismissed.

Fifth, Debtor's conduct with respect to the damage to the Lake House illustrates a lack of candor and good faith. The insurance check in the amount of $6,412.03 from State Farm for the damage was nev-er disclosed on Debtor's schedules despite him having been in possession of it at filing. (Letter dated June 9, 2015 from Russell Whittenburg to Dwayne Richard-son, Creditor's Ex. 1). Further, on Debt-or's Amended Statement of Financial Af-fairs, under Part 8 "Losses," Debtor checked "None," despite not only having suffered a loss, but actually having made a claim on it. Only on the day before trial did Debtor finally file a motion with re-spect to the check. (*Lemming II,* Doc. 52). That motion sought to reimburse Debtor's daughter for unspecified contri-butions she had made in repairing the property. Whether or not these contribu-tions constituted an undisclosed loan, Debtor obtained money from outside the estate and used it in connection with the plan without disclosing it to the Court.

Finally, the present case presents excep-tional circumstances which are not likely to exist in other "dirt-for-debt" cases. Un-like the typical senior lienholder of real property, Richardson did not obtain his status as a secured creditor through a bargained-for exchange. Consequently, he lacks the contractual right to charge the Debtor with costs for maintenance or dis-position of the collateral. This harsh re-sult stands in contrast to Richardson's treatment under Debtor's confirmed cas-cade plan from the prior case, where Debt-or committed to making efforts to liquidate

the properties to pay his claim. Further, the case is essentially a two-party dispute, and thus ill-suited to the provisions of Chapter 13. If the Court were to confirm Debtor's plan and proceed to a valuation of the property, Debtor could dismiss the case if the valuation was not to his liking.

For each of these reasons, the Court concludes that Debtor's Fifth Amended Chapter 13 Plan was not proposed in good faith, and thus that denial of confirmation is appropriate.

**B. Debtor's plan fails as a surrender plan.**

Having concluded that Debtor's plan was not proposed in good faith, the Court also holds as an alternative basis for denying confirmation that the plan fails to properly treat Richardson's secured claim under Section 1325(a)(5). That section governs the required treatment of allowed secured claims by Chapter 13 plans and sets forth three options for confirmation:

with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B) [the debtor retains the property securing the claim subject to cramdown requirements and proposes to distribute property valued at least equal to the claim as of the effective plan date]; or

(C) the debtor surrenders the property securing such claim to such holder.

11 U.S.C. § 1325(a)(5). The first question under that provision presented by Debtor's plan is whether, in a situation like the present case where the holder of the claim has not accepted the plan, a debtor is limited to choosing either subparagraph (B) or (C), or whether Debtor can invoke subparagraph (C) to surrender some collateral to satisfy part of the claim and subparagraph (B) to pay the remainder of the claim through the plan.

Debtor asserts that he may surrender only part of the collateral, and provide that after valuation any remaining secured claim be crammed down. Debtor provides two primary rationales for allowing this approach. First, that the rule of construction of Section 102(5) provides that "or" in provisions such as Section 1325(a)(5) "is not exclusive." (Debtor's Br. Supp. Confirmation at 3, *Lemming II,* Doc 38). Second, that Section 1322(b)(8) provides that a debtor may pay "all or part of a claim against the debtor from property of the estate or property of the debtor." (*Id.* at 11.)[4]

Two Courts of Appeals have considered the issue. Presented with an analogous surrender provision in Chapter 12, the Second Circuit interpreted the language of "the property securing such claim" in the surrender provision as referring to "the entire collateral." *First Brandon National Bank v. Kerwin (In re Kerwin),* 996 F.2d 552, 557 (2d Cir.1993). The Fifth Circuit followed suit, rejecting the argument that the rule of construction provided by Section 102(5) could be read to "create a fourth alternative" for Section 1325(a)(5). *Williams v. Tower Loan of Miss. (In re Williams),* 168 F.3d 845, 847 (5th Cir. 1999).

---

4. The Court interprets Section 1322(b)(8) in the following section. As noted above. Debtor abandoned his vesting argument. (Debtor's Supplemental Br. Supp. Confirmation, Doc. 42). Debtor makes a further argument that requiring a judgment debtor to surrender all of his property would produce inequitable results and frustrate the exemption scheme. (Debtor's Br. Supp. Confirmation at 6, Doc 38). However, in light of a debtor's ability to avoid a judgment lien to the extent in impairs exemptions in connection with a surrender plan, this argument does not carry much weight. 11 U.S.C. § 541(f).

Two bankruptcy court opinions also address the issue. The court in *In re Covington*, 176 B.R. 152, 154 (Bankr. E.D.Tenn.1994) refused to allow a partial surrender on Section 506(a) grounds, noting that the Bankruptcy Code "does not contemplate that a creditor holding a single claim secured by multiple items of property can sever each item of property into an independent allowed secured claim."

In contrast, the Bankruptcy Court for the Middle District of Georgia rejected *Williams* based on three principal grounds in *In re McCommons*, 288 B.R. 594 (Bankr.M.D.Ga.2002). First, that "[o]ne of the fundamentals concepts underlying all debtor-creditor law is the debtor's ability to surrender his rights in collateral at any time." *Id.* at 596–97. Second, that the plain language of 1325(a)(5), in light of Section 102(5), allows for a Debtor to meet either test or both. *Id.* at 597. Third, that 1325(a)(5) can be satisfied on an item-by-item basis so long as the value of the collateral is not dependent on it remaining a whole. *Id.*

The treatises are split on allowing a partial surrender. *Compare* 8 COLLIER ON BANKRUPTCY ¶ 1325.06 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015) ("When there are multiple items of collateral, the debtor may decide to surrender some items and retain others"), *and* KEITH LUNDIN AND WILLIAM H. BROWN, CHAPTER 13 BANKRUPTCY § 102.1[16] (4th ed. 2011) (noting an "all or nothing approach" is "inconsistent with the power of a Chapter 13 debtor in § 1322(b)(8) to 'provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor.' "), *with* GINSBERG & MARTIN ON BANKRUPTCY § 15.05[C][3][b] (5th ed. 2015) ("Generally, a plan may not propose to surrender a portion of the collateral in partial satisfaction of the secured

claim and cram down the remaining secured claim as it relates to the retained collateral.").

█ The Court finds the line of cases prohibiting partial surrender over objection of the creditor persuasive. The plain language of "the property securing such claim" in Section 1325(a)(5)(C) does not expressly provide for surrender of 'some' or 'part' of the property, but instead appears to provide for "the entire collateral." *Kerwin*, 996 F.2d at 557. This interpretation is bolstered by the fact that Section 506(a) does not provide a means to bifurcate a single oversecured claim into several smaller secured claims. *Covington*, 176 B.R. at 154.

Surrender is a process that for the most part requires no bankruptcy court supervision, and serves as a valuable tool for debtors to satisfy the claims secured by property they no longer need or to provoke cooperation from creditors who would prefer a steady cash flow to repossession. It does not, however, provide a means for a debtor to pick and choose from non-exempt assets to retain, subject to lengthy contested valuation procedures. This is so regardless of how "or" is interpreted in Section 1325(a)(5)—if "the property securing such claim" means all of the collateral, "picking two" will still require surrendering all of the collateral.

### C. Debtor's plan fails as a cramdown plan.

The Court's determination that Debtor may not proceed under Section 1325(a)(5)(C) (surrender) does not end the confirmation inquiry. The Court next considers whether, consistent with Section 1325(a)(5)(B) (cramdown), a plan may "effect[ ] a partial relinquishment of encumbered property as a transfer, instead of as a surrender." HOMER DRAKE, JR., PAUL W. BONAPFEL & ADAM GOODMAN, CHAPTER 13

PRACTICE & PROCEDURE § 5:19. Debtor asserts his plan can be confirmed under these grounds, relying on Section 1322(b)(8) (a plan may "provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor") and Section 1325(a)(5)(B)(ii) ("the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim").

To determine whether Debtor's plan may rely on these provisions as a basis for confirmation, the Court must determine first whether "payment" in Section 1322(b)(8) includes paying an objecting judgment creditor with real property and second whether the reference in Section 1325(a)(5)(B)(ii) to "property to be distributed under the plan" provides an independent basis for distributing real property to unaccepting creditors. The Court answers "no" to both questions.

### 1. Section 1322(b)(8) does not enable payment of a judgment creditor's claim with real property.

 Section 1322(b) supplies permissive provisions for a Chapter 13 plan. Under Section 1322(b)(8), a plan may "provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor." The Bankruptcy Code does not define "payment," and so it falls to the Court to construct its meaning. "Statutory construction begins with the language of the statute and where the language is plain, the sole function of the court is to enforce the statute according to its terms, unless those terms would lead to an absurd result." *In re TI Acquisition, LLC,* 410 B.R. 742, 748 (Bankr.N.D.Ga.2009) (citing *Lamie v. U.S. Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)). However, the plain language of "payment"

in the context of Section 1322(b)(8) is ambiguous. It is unclear whether "payment ... from property of the estate or property of the debtor" anticipates first reducing the property to cash or whether the property can be delivered as payment in kind. A possible interpretation is that it merely enables the debtor to either pay claims from property of the estate or from the debtor's own property, whether exempt under Section 522 or vested under Section 1327.

Taken out of context of the statute, the term "payment" does not clearly cover the situation of an involuntary delivery of property. Black's Law Dictionary defines "payment" as "1. Performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation. 2. The money or other valuable thing so delivered in satisfaction of an obligation." BLACK'S LAW DICTIONARY (10th ed. 2014). While "some other valuable thing accepted in partial or full discharge of the obligation" must include non-cash property, such "other valuable thing" must be "accepted." It follows that one interpretation of "payment" in Section 1322(a)(8) is the delivery of money or of some other non-monetary property to a creditor, provided that delivery of any such non-monetary property either (a) is consented to at confirmation, (b) has been previously accepted in satisfaction of the debt in the parties' course of dealings, or (c) in the case of commercial debt, is customarily accepted in satisfaction of that type of debt.

The court concludes that this definition is the best interpretation of Section 1322(a)(8) for three reasons: first, allowing delivery of property to a creditor in an unacceptable form short-circuits the creditor protections of surrender under Section 1325(a)(5)(C); second, such an approach follows nonbankruptcy law; and third, the

legislative history of Section 1322(b)(8) indicates that "payment" supports such a definition.

### a. Cramdown is not a surrender substitute.

The court begins its analysis with the widely accepted principle that "a plan cannot require a secured creditor to accept a surrender of property or take possession of or title to it through repossession or foreclosure." HOMER DRAKE, JR., PAUL W. BONAPFEL & ADAM GOODMAN, CHAPTER 13 PRACTICE & PROCEDURE § 5:9 (citing *In re Rose*, 512 B.R. 790 (Bankr.W.D.N.C.2014); *In re Moore*, 477 B.R. 918 (Bankr.S.D.Ga. 2012); *In re Brown*, 477 B.R. 915 (Bankr. S.D.Ga.2012); *In re Ogunfiditimi*, 2011 WL 2652371 (Bankr.D.Md.2011); *In re White*, 282 B.R. 418 (Bankr.N.D.Ohio 2002); & *In re Service*, 155 B.R. 512 (Bankr.E.D.Mo.1993)); *see also Bank of New York Mellon v. Watt*, No. 3:14–CV–02051–AA, 2015 WL 1879680 (D.Or. Apr. 22, 2015). The weight of this case law would necessarily be diluted by an interpretation of Section 1322(b)(8) that enabled payment in kind of a judgment creditor's claim with encumbered property by means of a cramdown plan.

The bankruptcy court in *In re Rose* considered whether another provision in Section 1322(b) could overcome the limitations on surrender by means of compelled vesting. 512 B.R. at 794–95 (examining 11 U.S.C. § 1322(b)(9)). The court declined to adopt this interpretation, noting that it could "significantly injure" the secured creditor by exposing it to burdens of ownership such as taxation, subject it to junior liens that would have been wiped out in foreclosure, and threaten it with potential environmental or premises liability. *Id.* at 796. While Debtor has abandoned his vesting argument, payment in kind is the functional equivalent. A creditor subjected to cramdown of real property is faced with a Hobson's choice: take this property, subject to all of the above concerns, or lose out on all distribution under the plan and, assuming a discharge is entered, the collateral itself. 11 U.S.C. § 1325(a)(5)(B)(i)(I), (I)(aa)-(bb) (requiring that "the holder of such claim retain the lien securing such claim until the earlier of ... the payment of the underlying debt determined under nonbankruptcy law; or ... discharge under section 1328"). The potential for injustice posed by this interpretation is only increased where, as is the presently the case, the secured creditor is a judgment creditor who, unlike a mortgage creditor, did not bargain for the possibility of taking on the ownership of the collateral and who does not have the contractual right to charge the Debtor with costs for maintenance or disposition of the collateral.

### b. State law requires tender in an acceptable form.

■ Bankruptcy provisions regarding secured claims are enacted against the backdrop of state law defining rights in collateral. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (U.S.1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). Further, the bankruptcy code expressly incorporates state law on satisfaction of liens in Chapter 13 cramdowns. 11 U.S.C. § 1325(a)(5)(B)(i)(I)(aa)-(bb) (providing "the holder of [a secured] claim retain the lien securing such claim until the earlier of ... the payment of the underlying debt determined under nonbankruptcy law" or discharge).

Under nonbankruptcy law, a lien is generally terminated upon tender of payment, but "tender must be made with 'money in

hand' to be effective." William Houston Brown, THE LAW OF DEBTORS AND CREDITORS § 9:9; *see also id.* § 8:11. Tender also arises in the analogous context of mortgage law when borrowers seek to enjoin foreclosure or redeem their mortgage. Under Georgia law, "tender must be certain and unconditional, and be in full payment of the specific debt. A written proposal to pay money, with no offer of the cash, is not a tender." *Edward v. BAC Home Loans Servicing, L.P.*, 534 Fed. Appx. 888, 892 (11th Cir.2013) (citing O.C.G.A. § 13-4-24; *Crockett v. Oliver*, 218 Ga. 620, 129 S.E.2d 806, 807–08 (1963)) (internal citations omitted); *see also In re McKinney*, 174 B.R. 330, 334 (Bankr. S.D.Ala.1994) ("[U]nder Alabama law, the only way to redeem the property is through a cash payment of the full amount of the mortgage debt under the right of statutory redemption.").

Similarly, the Court is aware of no state law which would enable a debtor to compel a creditor to accept title to its collateral in lieu of tender of cash. *See In re Rose*, 512 B.R. 790, 795 (Bankr.W.D.N.C.2014) (citing Florida law). The Court will not read such a sweeping departure from state law into the undefined term "payment" absent more explicit guidance from Congress. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 543, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("[A]bsent clearer textual guidance than ... a phrase entirely compatible with pre-existing practice[,] we will not presume such a radical departure [from historical debtor-creditor jurisprudence]")

**c. Legislative history does not support Debtor's interpretation.**

Lastly, the legislative history of the provision demonstrates that the congressional intent behind Section 1322(b)(8), added in the 1978 Bankruptcy Reform Act, was not to authorize transfers of property in kind, but rather to permit debtors to use their prepetition property to pay claims in addition to their postpetition wages. The Commission on the Bankruptcy Laws, created by Congress in 1970, wrote instructively of the need for this change from the 1898 Bankruptcy Act:

F. Inclusion of Assets Other Than Future Income.

Present Chapter XIII contemplates that a plan should provide for the payment of debts only out of "future earnings or wages." ... If composition of debts is to be encouraged as an alternative to straight bankruptcy for debtors with regular income, the application of a debtor's nonexempt assets to reduce the amount of the indebtedness to be payable out of future income should be authorized, and indeed the use of nonexempt assets may likewise be appropriate in a plan contemplating an extension without reduction of debts. Otherwise, a plan proposed by such a debtor may not be in the best interests of the creditors. The Commission accordingly recommends that the proposed Act authorize the **payment of debts out of proceeds of the sale** of his nonexempt assets as well as future income.

*Report of the Commission on the Bankruptcy Laws of the United States,* H.R. Doc. No. 93–137, at 163–64, 93d Cong., 1st Sess. (1973), *as reprinted in* App. B COLLIER ON BANKRUPTCY App. Pt. 4–416 to –417 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015) (emphasis added).

The Judiciary Committee report on the 1978 Bankruptcy Reform Act makes clear that this recommendation was adopted by stating that under the 1978 Act, "[the plan] may provide for the payment of those [creditor's] claims only out of future income, or out of future income **and through liquidation of some of the debtors property** .... (proposed 11 U.S.C. 1322(b)(8)).

Unlike current law, the plan may provide for payment of creditors out of property other than future income or earnings of the debtor." H.R. REP. 95–595, at 123 & n.597, *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6084 (emphasis added). Thus, it appears that Section 1322(b)(8) was enacted to enable payment of claims from property of the estate or debtor only after such property was liquidated.

The Court does not hold that a Chapter 13 plan can never provide that a secured claim will be satisfied by the direct transfer of collateral to the secured creditor, but only that 1322(b)(8) does not provide a means to pay an unaccepting judgment creditor's claim with real property. The Court is aware of cases allowing for payment in kind in the Chapter 12 context on the basis of identical statutory language. *Kerwin*, 996 F.2d at 558 (citing *In re Durr*, 78 B.R. 221 (Bankr.D.S.D.1987) *and In re Lairmore*, 101 B.R. 681, 683 (Bankr. E.D.Okla.1988)). Those cases involved agricultural lenders in a specialized industry. If trade custom or course of dealings entails routine settlement of debt with something other than money, it is possible that a plan in a Chapter 12 case or a Chapter 13 business case could provide for such a payment in kind. Alternatively, provisions in other chapters of the Bankruptcy Code specifically allow for asset payment plans. *See* 11 U.S.C. § 1129(b)(2)(A)(iii) (providing "for the realization by [secured creditors] ... of the indubitable equivalent of such claims" in a Chapter 11 cramdown). However, in the absence of such provisions in Chapter 13, the Court will not read in their equivalent.

2. **"[P]roperty to be distributed" under Section 1325(a)(5)(B)(ii) does not create an independent basis to pay claims in kind.**

■ Section 1325(a)(5)(B)(ii) provides that a court shall confirm a Chapter 13

plan, if, in addition to the other cramdown requirements, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." Debtor did not brief the issue of whether this language provides an independent basis for payment in kind, but several of the cases he cited relied upon it and so the Court addresses it briefly. *See Kerwin*, 996 F.2d at 558 (interpreting " 'property to be distributed' under [analogous Chapter 12 provision] as any property to be transferred under the plan" including the collateral); *see also* 8 COLLIER ON BANKRUPTCY ¶ 1325.06 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015). (" 'Property' is not a defined term, but it is altogether unrestricted in scope and unquestionably encompasses any and all kinds of property of the estate and property of the debtor 'to be distributed under the plan." ').

As an initial matter, the Court agrees that "value ... of property to be distributed" is broad enough to include non-cash property. However, this alone does not provide a basis to confirm Debtor's plan.

Both Section 1322 and Section 1325 regulate plan provisions. Section 1322 contains the building blocks of a plan, while Section 1325 tests whether the plan may stand. Consequently, the provisions of Section 1325 do not in and of themselves create a basis for a plan to do something not enabled by Section 1322. By testing whether "the value ... of property to be distributed" under a plan equals or exceeds the allowed secured claim, Section 1325 permits a plan to be confirmed prior to reducing the property to acceptable form. For example, if a debtor proposed a distinct fund of non-cash property to be liquidated to pay a claim, as was the case with Debtor's original "cascade plan," a court could confirm that plan based on the

value of the property instead of requiring the debtor to liquidate the property pre-confirmation. (*Lemming II*, Doc. 2). The provision does not circumvent the requirement discussed in the above section that payment of a claim under 1322(b)(8) must be in cash or another acceptable form.

### III. Conclusion

For the foregoing reasons, confirmation of Debtor's Chapter 13 plan is unwarranted. Accordingly, it is

**ORDERED** that Confirmation of Debtor's Fifth Amended Chapter 13 Plan (Doc. 41) is **DENIED.** Debtor may file an amended plan within 15 days of the date of entry of this Order. If Debtor fails to do so, the Trustee may submit a Supplemental Report recommending dismissal and on receipt of such report, the Clerk of Court is hereby authorized and directed to enter an Order of Dismissal without additional notice of hearing.

The Clerk is directed to serve a copy of this Order upon Debtor, counsel for Debtor, the Chapter 13 Trustee, and all creditors in the case.

**IT IS ORDERED**